Argued May 28, reversed and remanded July 10, 1923.

# UNITED STATES F. & G. CO. *v.* BRAMWELL.

(217 Pac. 332.)

**Common Law—Adopted as Part of Laws of Oregon.**

1. The common law of England modified and amended by English statutes as it existed at the time of the American Revolution as far as it was general and not local in its nature and applicable to the conditions of the people and incompatible with the nature of our political institutions, or in conflict with Constitution and laws of the United States or of Oregon has been adopted as a part of the law of the state, in view of Article I, Section 2, of the Organic Law of the civil government of Oregon adopted July 26, 1845, and of Constitution of 1857, Article XVIII, Section 7.

**States—Right of State to Priority of Payment in Insolvency Part of Common Law.**

2. The preference right of the state to priority in payment out of the effects of an insolvent debtor is based upon the common law and became part of the law of the state through the adoption of the common law.

**States—Sovereign Right of State to Priority in Insolvency Reserved to It Under Federal Constitution.**

3. Right of the state to exact priority of payment from the assets of insolvent debtor, of whom the United States is not itself a creditor, is reserved by virtue of Constitution of the United States Amendment 10.

**Subrogation—"Subrogation" Defined.**

4. Subrogation is the substitution of another person in place of the creditor to whose rights he succeeds in relation to the debtor, and gives to the substitute all other rights, priorities, remedies, liens and securities of the party for whom he is substituted.

**Subrogation—Elements Entitling Party to Remedy Enumerated.**

5. The payment for which subrogation is claimed must have been made under compulsion or for the protection of some interest of the party making it and in discharge of an existing liability, subrogation only being allowed where the entire debt has been paid, and to entitle party thereto his equity must be strong and his case clear.

---

3. Priority of state or United States in payment of assets of debtor, see notes in 4 Ann. Cas. 973; 29 L. R. A. 226; 1 L. R. A. (N. S). 255; 46 L. R. A. (N. S.) 260; L. R. A. 1918A, 398.

Subrogation—Surety Held Subrogated to Rights of State Against Insolvent State's Depositary and Unsecured Creditors.

6.   Where a surety company had, under Section 2739, Or. L., executed its bond to secure repayment to the state of funds deposited by the state treasurer under Sections 2732–2758, Or. L., in a state bank, the bond being conditioned that in event of the bank's default in payment the surety would pay the same, and the bank became insolvent and state superintendent of banks took possession in accordance with Sections 6221–6223, Or. L., and the surety paid to the state the amount of its deposit, the surety was entitled to be subrogated to all the rights and priority which the state itself could have asserted against the bank and its unsecured creditors.

States—Common-law Right of State to Preference in Payment in Insolvency Exists Unless Taken Away by Express Statutory Provision.

7.   The common-law right of the state to a preference in payment in case of insolvency of a depositor of state money exists, unless taken away by some express statutory provision, the sovereign not being bound by the general language of statute unless specifically mentioned therein.

Statutes—Extraneous Facts may be Considered in Interpreting Statute Where Language Ambiguous.

8.   The legislative intent must be gathered from the language of the act, though, where the meaning of the words and language employed are ambiguous and of doubtful import, extraneous facts may be considered to aid in its interpretation.

States—Possession of Insolvent Bank by Superintendent of Banks Held not to Defeat State's Priority as Creditor.

9.   Where a state bank is insolvent within the provisions of Sections 6221–6223, Or. L., and the state superintendent of banks takes possession of the assets, such possession does not defeat the right of the state to collect its debt or to assert its priority, the bank's title to its assets not being divested until they are sold.

From Crook: T. E. J. Duffy, Judge.

In Banc.

REVERSED AND REMANDED.

For appellant there was a brief over the name of *Messrs. Dey, Hampson & Nelson,* with an oral argument by *Mr. G. L. Buland.*

---

6.  Right of surety who discharges obligation due to government to be subrogated to priority or preference of latter, see note in 24 A. L. R. 1502.

For respondent there was a brief over the names of *Mr. Willard H. Wirtz*, District Attorney, and *Messrs. Bowerman & Kavanaugh*, with oral arguments by *Mr. Wirtz* and *Mr. J. P. Kavanaugh*.

RAND, J.—The plaintiff, the United States Fidelity & Guaranty Company, appeals from a decree sustaining a general demurrer to its complaint and dismissing its suit. The complaint alleges, among others, the following facts: That the state treasurer, pursuant to the provisions of Chapter 3, Title XXIV, Or. L., deposited $4,005.92 of funds belonging to the state in the Crook County Bank of Prineville, Oregon, a state bank. The plaintiff, under the provisions of Section 2739, Or. L., executed, as surety, its bond to secure the repayment to the state of the funds so deposited. The bond was conditioned that in the event of the bank's default in the repayment of the money so deposited, the surety would pay the same. The bank became insolvent and the defendant, the superintendent of banks for the State of Oregon, took possession of its assets, property and business, and now has possession thereof and is engaged in liquidating the indebtedness of the bank, in accordance with the provisions of Chapter 5, Title XXXV, Or. L. The plaintiff, as surety, paid to the state the amount of its deposit and thereupon demanded that the defendant repay plaintiff the amount so paid before paying the claims of general creditors. It appears that the assets of the bank are insufficient to pay all claims in full. The complaint also alleges that the state was entitled to a priority of payment as against all depositors and creditors of said bank not having an antecedent lien, and that by reason of the payment by plaintiff of

the bank's debt to the state, the plaintiff is entitled to be subrogated to the right of the state to priority in payment over general creditors of the bank. This suit was brought for the purpose of having its claim so allowed and paid.

The lower court sustained a general demurrer to the complaint on the assumption that the common law has not been adopted in this state by any constitutional or statutory provision, and therefore before the common-law prerogative right of the British Crown, to priority in payment of debts due it from an insolvent debtor as against creditors not having a specific lien, can exist in favor of the state, it must rest upon statute, and there being no statute conferring the right, the state is not entitled to priority, and this is one of the questions we are called upon to decide.

The common law of England, modified and amended by English statutes, as it existed at the time of the American Revolution, as far as it was general and not local in its nature and applicable to the conditions of the people and not incompatible with the nature of our political institutions or in conflict with the Constitution and laws of the United States or of this state, except as modified, changed or repealed by our own statutes, has been adopted and is in force in this state: *Peery* v. *Fletcher,* 93 Or. 43 (182 Pac. 143).

By Section 2, Article I of the Organic Law of the provisional government of Oregon, adopted by the vote of the people on July 26, 1845, it was declared that:

"The inhabitants of said territory shall always be entitled to the benefits of the writ of *habeas corpus* and trial by jury, of a proportionate representation of the people in the legislature, and of judicial

proceedings, according to the course of common law.'' See Gen. Laws of Oregon, 1845–64, compiled and annotated by M. P. Deady, p. 59.

In recognition of the laws in force under the provisional government, Congress, in establishing the territorial government of Oregon, on August 14, 1848, enacted:

''That all suits, process and proceedings, civil and criminal, at law and in chancery, * * which shall be pending and undetermined in the courts established by authority of the provisional government of Oregon, within the limits of said territory, when this act shall take effect, shall be transferred to be heard, tried, prosecuted and determined in the district courts hereby established. * * All bonds, recognizances and obligations of every kind whatsoever, valid under the existing laws within the limits of said territory, shall be valid under this act; * * and all * * actions and causes of action, may be recovered under this act, in like manner as they would have been under the laws in force within the limits composing said territory at the time this act shall go into operation,'' etc. Gen. Laws of Or. of 1845–64, by M. P. Deady, p. 77, § 17.

Section 7, Article XVIII of the Constitution adopted by the people on September 18, 1857, provides that ''All laws in force in the territory of Oregon when this Constitution takes effect, and consistent therewith, shall continue in force until altered or repealed.''

In the determination of causes, the courts of this state have, in the absence of statute, always followed and applied the general rules of the common law in so far as those rules were found to be applicable to existing conditions and suitable to the needs and necessities of the people. Of necessity this is so, as otherwise, in the absence of statute, there would have

been no rule of decision and the decisions rendered would have had no authority to sustain them. In fact, in nearly every reported decision of this court, up to the time Oregon was admitted as a state in 1859, we find the court, in the absence of statute, determining and enforcing the rights, interests and estates of the parties, construing statutes and interpreting written instruments according to the rules of the common law as announced by the common-law courts and text-writers of England and of this country. In the entire volume of the first Oregon Reports covering said period, there is hardly a decision where the rules of the common law in some respects were not applied and followed by those distinguished jurists, GEORGE H. WILLIAMS, C. J., MATTHEW P. DEADY, J., and REUBEN P. BOISE, J., whose wide and extensive knowledge of the common law made them so justly eminent in their profession.

Speaking of common law in Oregon, Mr. Justice GRAY, in *Shively* v. *Bowlby,* 152 U. S. 331 (38 L. Ed. 331, 14 Sup. Ct. Rep. 548, see, also, Rose's U. S. Notes), said:

"The settlers of Oregon, like the colonists of the Atlantic states, coming from a country in which the common law prevailed to one that had no organized government, took with them, as their birthright, the principles of the common law, so far as suited to their condition in their new home. The jurisprudence of Oregon, therefore, is based on the common law."

1. It is therefore too late to now contend that the common law of England, within the limitations laid down in *Peery* v. *Fletcher, supra,* has not been adopted as a part of the law of the state.

"The term 'common law of England' refers to that general system of law which prevails in Eng-

land, and in most of the United States by deriva-
tion from England, as distinguished from the Roman
or civil law system." 12 C. J. 177, § 2.

"The principles of equity are part of our common
law. It is the very essence of common or customary
law that it consists of those principles and forms
which grow out of the customs and habits of the
people. It is therefore involved in its very nature
that only so much of the English law as is adapted
to our circumstances and customs is properly recog-
nized as part of our common law." Lowrie, J.,
in *Pennock's Estate*, 20 Pa. St. 268 (59 Am. Dec.
718).

"In New Hampshire," said the court in *Wells* v.
*Pierce*, 27 N. H. 503, 512, "equity, as a great branch
of the law of their native country, was brought over
by the colonists, and has always existed as a part of
the common law, in its broadest sense."

"Equity was brought over to this country by the
English colonists together with the common law as
one of their established institutions." 21 C. J. 31,
§ 7.

"At common law," said Mr. Justice Brandeis, in
*Marshall* v. *New York*, 254 U. S. 380 (65 L. Ed. 315, 41
Sup. Ct. Rep. 143) "the crown of Great Britain, by
virtue of a prerogative right, had priority over all
subjects for the payment out of a debtor's property
of all debts due it. The priority was effective alike
whether the property remained in the hands of the
debtor, or had been placed in the possession of a
third person, or was *in custodia legis*. The priority
could be defeated or postponed only through the
passing of title to the debtor's property, absolutely
or by way of lien, before the sovereign sought to
enforce his right."

"As to the third protection *cum clausula volumus,*
the king by his prerogative regularly is to be pre-
ferred in payment of his duty or debt by his debtor
before any subject, although the king's debt or duty
be the latter; and the reason hereof is, for that
*thesaurus regis est fundamentum belli, et firmamen-
tum pacis*. (1) And thereupon the law gave the

king remedy by writ of protection to protect his debtor, that he should not be sued or attached until he paid the king's debt. But hereof grew some inconvenience, for to delay other men of their suits, the king's debts were the more slowly paid. And for remedy thereof, it is enacted by the statute of 25 E. 3, that the other creditors may have their actions against the king's debtor, and proceed to judgment, but not to execution, unless he will take upon him to pay the king's debt, and then he shall have execution against the king's debtor for both the two debts." 1 Coke on Littleton, Butler & Hargrave's notes, §§ 199, 131b.

According to Blackstone, the royal prerogatives of the British Crown were of two classes, for he says:

"Prerogatives are either direct or incidental. The direct are such positive substantial parts of the royal character and authority as are rooted in and spring from the king's political person, considered merely by itself, without reference to any other extrinsic circumstance; as, the right of sending embassadors, of creating peers, and of making war or peace. But such prerogatives as are incidental bear always a relation to something else, distinct from the king's person; and are indeed only exceptions, in favour of the crown, to those general rules that are established for the rest of the community; such as, that no costs shall be recovered against the king; that the king can never be a joint tenant; and that his debt shall be preferred before a debt to any of his subjects." 1 Black. Com., Cooley's 4 ed., top *240.

It is clear that none of the royal prerogatives of the first class mentioned by Blackstone, that is to say, those direct prerogatives which appertained to the royal character and authority of the king and sprung from his political person, are adapted to or suitable for our needs or conditions, and hence the common-law rules by which those prerogatives were

established and maintained are not in force in this state. But those incidental prerogatives which had no relation to the king's person and constituted exceptions in favor of the crown to general rules applicable to everyone else, and which, from their very nature, are essential to the welfare of the people of the state, have been adopted, and the common-law rules by which these rights were established, have become the law of the state. Among those so adopted are the common-law rules that general words in a statute do not include the state unless the state is expressly named therein; that the state cannot be sued without its consent; that the statute of limitations does not run against the state in the absence of a statute permitting it; that a debt due to the state is preferred over that of anyone else not having an antecedent lien, and the like. To all of the incidental prerogative rights of the British Crown, which are essential to the efficient exercise of the powers inherent in the nature of civil government, the people of this state have succeeded.

2. The preference right of the state to priority in payment out of the effects of an insolvent debtor is based upon the common law and requires no statute for its support. The existence and enforcement of the right are necessary for the protection of the public revenue. That the right would be of essential importance to the state if both the depositary bank and the surety company should become insolvent, is obvious. The right is therefore one that is adapted to the circumstances, conditions and necessities of the people because essential to sustain the public burdens and discharge the public debts; and unless some provision of statute can be found which clearly evinces a legislative intent to abandon or waive this prefer-

ence right of the state it is the duty of the courts to preserve rather than to defeat it.

As to the government of the United States the rule is different. Before the right can prevail in favor of the national government, it must rest exclusively upon a federal statute, for in *United States* v. *Bank of North Carolina,* 31 U. S. 19, 6 Pet. 29 (8 L. Ed. 308), the court said:

"The claim of the United States, however, does not stand upon any sovereign prerogative, but is exclusively founded upon the actual provisions of their own statutes."

From this the defendant argues that there must be a state statute conferring this right upon the state before the right can exist in favor of the state. But it is pointed out in *United States Fid. & Guar. Co.* v. *Borough Bank,* 161 App. Div. (N. Y.) 479, 486 (146 N. Y. Supp. 870), that the reason for the priority right of the federal government being dependent upon and not existing independently of a federal statute, is the fact that

"There is no common law of the United States in the sense of a national customary law, distinct from the common law of England, as adopted by the several states each for itself applied as its local law. *Smith* v. *Alabama,* 124 U. S. 478 (31 L. Ed. 512, 8 Sup. Ct. Rep. 564), citing *Wheaton* v. *Peters,* 8 Pet. 591 (8 L. Ed. 1055)."

As the federal government does not have a customary common law of its own, distinct from that of the states themselves, it necessarily results that the right itself must depend exclusively upon a federal statute, and hence the fact that it does so depend, affords no support for the contention here made that the right of the state likewise depends upon a state statute,

because this state, unlike the federal government, does have a customary common law of its own upon which the right is founded. In *Marshall* v. *New York, supra,* the court said:

"In the case at bar the district judge relied upon Section 197 as justifying him in giving priority for the claim for annual franchise taxes; and in denying priority for the claim for license fees because in respect to the latter no corresponding provision is to be found in the tax law. But he had no occasion to seek statutory support for the priority sought by the state; since here it does not seek to displace any prior lien. It asks merely to have its prerogative right enforced against property on which there is no prior lien and upon which it is impossible to levy because the property has been taken out of the hands of the debtor and placed in the custody of the court for purposes of protection and distribution. * * Here it is not sought to gain priority over a lien existing at the time when the receiver was appointed; and the priority over unsecured creditors is granted by the common law of New York."

Hence it will be seen that while the federal courts hold that for a priority right to exist in the federal government, it must rest upon a federal statute, yet, where the priority claimed by the state does not seek to displace a prior lien, the Supreme Court of the United States recognizes and upholds such priority right, although it rests upon the common law alone and has no statute for its support.

That the several states of the Union, based solely upon their adoption of the common law and without the aid of any state statute for its support, have succeeded to the prerogative right of the British Crown to priority in payment out of the assets of an insolvent debtor as against all persons not having an antecedent lien, is established by the great weight

of authority in other jurisdictions.    Holding to this
effect are the following cases: *United States Fid. &
Guar. Co.* v. *Carnegie Trust Co.,* 161 App. Div.
(N. Y.) 249 (146 N. Y. Supp. 804), affirmed 213 N. Y.
629 (107 N. E. 1087); *United States Fid. & Guar. Co.*
v. *Borough Bank,* 161 App. Div. (N. Y.) 479 (146
N. Y. Supp. 870), affirmed 213 N. Y. 628 (107 N. E.
1068); *In re Niederstein,* 154 App. Div. (N. Y.) 238
(138 N. Y. Supp. 952); *Matter of Carnegie Trust Co.,*
206 N. Y. 390 (99 N. E. 1096, 46 L. R. A. (N. S.) 260;
*Central Trust Co.* v. *New York C. & Northern
R. R. Co.,* 110 N. Y. 250 (18 N. E. 92, 1 L. R. A. 260);
*Matter of Receivership Columbian Ins. Co.,* 3 Abb.
Dec. (N. Y.) 239; *Booth & Flinn* v. *Miller,* 237 Pa.
285 (85 Atl. 457); *United States Fid. & Guar. Co.* v.
*Rainey,* 120 Tenn. 357 (113 S. W. 397); *State* v. *Bell,*
64 Minn. 400 (67 N. W. 212); *American Surety Co.*
v. *Pearson* 146 Minn. 342 (178 N. W. 817); *Aetna
Accident & Liability Co.* v. *Miller,* 54 Mont. 377
(170 Pac. 760, L. R. A. 1918C, 954); *Watts* v. *Kinney,*
3 Leigh (Va.), 272, 295 (23 Am. Dec. 266); *Woodyard*
v. *Sayre,* 90 W. Va. 295 (110 S. E. 689); *Hoke* v. *Hen-
derson,* 14 N. C. 20; *State* v. *Williams,* 101 Md. 529
(61 Atl. 297, 109 Am. St. Rep. 579, 4 Ann. Cas. 970,
1 L. R. A. (N. S.) 254; *State* v. *Bank of Maryland,*
6 Gill & J. 205 (26 Am. Dec. 561); *State* v. *Mayor
of Baltimore,* 10 Md. 505; *Jones* v. *Jones,* 1 Bland
(Md.), 443 (18 Am. Dec. 327); *Smith* v. *State,* 5 Gill
(Md.), 45; *Contee* v. *Chew,* 1 Har. & J. (Md.) 417;
*State* v. *Rogers,* 2 Har. & McH. (Md.) 198; *Murray*
v. *Ridley,* 3 Har. & McH. (Md.) 171; *Orem* v. *Wright-
son,* 51 Md. 34 (34 Am. Rep. 286); *State* v. *Baltimore
& O. R. Co.,* 34 Md. 374; *Central Bank* v. *State,* 139
Ga. 54 (76 S. E. 587); *Booth* v. *State,* 131 Ga. 750
(63 S. E. 502); *County of Glynn* v. *Brunswick Ter-*

*minal Co.,* 101 Ga. 244 (28 S. E. 604); *Seay* v. *Bank,* 66 Ga. 609; *Robinson* v. *Bank of Darien,* 18 Ga. 65; *State* v. *Dickson,* 38 Ga. 171.

The only cases to which our attention has been called by counsel or that we have been able to find denying the right of the state to priority are the following: *Freeholders etc.* v. *Bank,* 29 N. J. Eq. 268, affirmed 30 N. J. Eq. 311; *State* v. *Harris,* 2 Bail. (S. C.) 598; *State* v. *Cleary,* 2 Hill (S. C.), 600; *Shields* v. *Thomas,* 71 Miss. 260 (14 South. 84, 42 Am. St. Rep. 458); *Potter* v. *Fidelity Deposit Co.,* 101 Miss. 823 (58 South. 713); *Keckley* v. *Keckley,* 2 Hill's Eq. (S. C.) Ch. 250; *Commissioners etc.* v. *Greenwood,* 1 Desaus. (S. C.) 450; *Brown* v. *American Bonding Co.,* 210 Fed. 844 (127 C. C. A. 406); *Central Trust Co.* v. *Third Ave. R. Co.,* 186 Fed. 291 (110 C. C. A. 1).

The decision of the Circuit Court of Appeals for the Second District in *Central Trust Co.* v. *Third Ave. R. Co., supra,* holding that the State of New York has no priority in payment of debts due it, and that of the Circuit Court of Appeals of the Ninth District, in *Brown* v. *American Bonding Co., supra,* holding to the same effect as to the State of Montana, have not been sustained, for it is said in *Marshall* v. *New York, supra,* that "Whether the priority enjoyed by the State of New York is a prerogative right or merely a rule of administration, is a matter of local law. Being such, the decisions of the highest courts of the state as to the existence of the right and its incidents will be accepted by this court as conclusive." The recent New York cases and the Montana case cited above show that the highest courts of both of these states have held that the common-law priority right of the state does exist in each of said states, and those decisions by the courts of the State

108 Or.—18

of New York and of the State of Montana are binding and conclusive upon the federal courts upon that question in its application to those states under the authority of *Marshall* v. *New York, supra.* None of the other cases present any persuasive argument or advance any convincing reason against the existence of the preference right of the state to priority of payment from the effects of an insolvent debtor.

Our attention has also been directed by the defendant to the language of the court in *Brown* v. *American Bonding Co., supra,* where the Circuit Court of Appeals for the Ninth Circuit, in holding that the bonding company, which paid to the state treasurer of the State of Montana, as surety for an insolvent bank, the amount of the state's deposit seeking to be subrogated to and enforce against the receiver of the insolvent bank, the alleged preference right of the state to be paid in full before the general creditors of the bank were paid, was not entitled to subrogation, after stating that the United States does not possess such a prerogative right, said: "Surely no state can have any greater sovereign right than the general government of the entire country."

3. The 10th amendment to the federal Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people." Hence, every state of the Union possesses all of the powers of sovereignty not so delegated or prohibited, and these include every power of civil government, the exercise of which is not in conflict with the powers delegated to the United States or prohibited to the states. The exercise by a state of its sovereign right to exact priority of payment from the assets of an insolvent debtor, of whom the

United States is not itself a creditor, is not in conflict with the powers of the federal government, and is an exercise of sovereignty upon the part of the state within the particular sphere for which the state governments were instituted, and is in respect to a matter of no concern to the federal government, and as to which the decisions of the highest courts of the state are binding and conclusive, and as the State of New York does possess and can enforce this priority right as was held in *Marshall* v. *New York, supra,* and the federal government, in the absence of statute, cannot possess or enforce such right, as was held in *United States* v. *Bank of North Carolina, supra,* then, it follows that a state, in some instances, can possess and enforce prerogative rights which are not possessed by the national government in the absence of a federal statute.

Defendant also contends that the following cases support the contention that the right of the state to priority of payment from the assets of an insolvent debtor does not exist independently of statute: *Bank Commr.* v. *Bank,* 161 Mich. 691 (125 N. W. 424, 127 N. W. 351); *State* v. *First State Bank,* 22 N. M. 661 (167 Pac. 3, L. R. A. 1918A, 394); *State* v. *People's Bank,* 23 N. M. 282 (168 Pac. 526); *State* v. *Foster,* 5 Wyo. 199 (38 Pac. 926, 63 Am. St. Rep. 47, 29 L. R. A. 226); *Aetna Casualty & Liability Co.* v. *Moore,* 107 Wash. 99 (181 Pac. 40); *National Surety Co.* v. *Pixton* (Utah), 208 Pac. 678. But a careful examination of those cases will disclose that the courts of those states refused to pass upon the question of whether the state, as against general creditors, did have a preference right to priority in payment of debts due the state, holding it to be unneces-

sary for decision, and deciding the cases upon other grounds.

Hence, it will be seen that the courts of New Jersey, South Carolina and Mississippi are the only courts that hold the right of the state to priority in payment, as against general creditors, does not exist in the absence of a statute conferring the right, while the courts of all the other states passing upon the question hold that the right does not depend upon statute but is based upon the common law. Therefore, in conformity to the great weight of authority, and in accordance with what we deem to be the better reasoning, we hold that the State of Oregon possesses the preference right to priority in payment of debts due the state out of the assets of an insolvent debtor as against all persons not having an antecedent lien; that this right does not rest upon statute, but is based upon the common law, and that the rule of the common law upon which the right depends, has been adopted and is in force in this state.

The defendant also contends that the plaintiff, although a surety, upon payment of a debt due to the state, became a mere creditor of the insolvent bank and occupies no more favorable position than that of any other general creditor. This is tantamount to an assertion that a surety, who has been compelled to pay the state a debt due, it, is entitled to pursue his legal remedy against his principal only and is not entitled to be subrogated to the rights of the state.

We are unable to find any authority to sustain this contention. A careful reading of the opinions in all of the cases heretofore cited will disclose that in every case where a surety had paid a debt due to the state and it was held that the state itself was entitled

to enforce priority in payment out of the assets of an insolvent debtor, it was likewise held that the surety who had paid the debt was subrogated to the same right to priority in payment that the state itself had.

4, 5. Subrogation is the substitution of another person in place of the creditor to whose rights he succeeds in relation to the debt, and gives to the substitute all of the rights, priorities, remedies, liens and securities of the party for whom he is substituted. It stands upon the same broad principle of natural justice that makes one surety entitled to contribution from another, and is broad enough to cover every instance in which one party is required to pay a debt for which another is primarily answerable, and which, in equity and good conscience, ought to be discharged by the latter. It is a mode which equity adopts to compel the ultimate discharge of a debt by him who in equity and good conscience ought to pay it and relieve him whom none but the creditor could ask to pay, and where one has been compelled to pay a debt which ought to have been paid by another, he is entitled to exercise all of the remedies which the creditor possesses against that other and to indemnity from the fund out of which should have been made the payment which he has made. The right to be subrogated is not dependent upon legal assignment, nor upon contract, agreement, stipulation or privity between the parties to be affected by it; but the party who paid the debt must not be a mere volunteer. The payment for which the subrogation is claimed must have been made under compulsion or for the protection of some interest of the party making it and in discharge of an existing liability, and subrogation is only allowed where the entire debt has been paid. To entitle a party to subrogation, his

equity must be strong and his case clear, as subrogation will not be enforced where the equities are equal or the rights not clear or to the prejudice of the legal or equitable rights of others. The party subrogated acquires the same but no greater rights, than those for whom he is substituted.

In *United States Fid. & Guar. Co.* v. *Carnegie Trust Co.*, *supra*, the court said:

"It is familiar law that a surety paying the debt of his principal is entitled to be subrogated to all of the creditor's rights, privileges, liens, judgments and mortgages, and that to enjoy the benefit of these no assignment from the creditor is necessary. The surety, by the mere fact of payment, is put into the shoes of the creditor."

In *United States Fid. & Guar. Co.* v. *Borough Bank, supra,* it was said:

"The equitable doctrine of subrogation contemplates full substitution. Thus in *Lidderdale* v. *Robinson* (2 Brock. 129, 168; affirmed 12 Wheat. 594), MARSHALL, Ch. J., at Circuit Court says that the claim of the surety is clothed in equity with the legal garb with which the original contract is invested (cited and approved in *Pease* v. *Egan,* 131 N. Y. 272), and in *Hayes* v. *Ward* (4 Johns. Ch. 123), KENT, C., says: 'It is equally a settled principle in the English chancery, that a surety will be entitled to every remedy which the creditor has against the principal debtor, to enforce every security, and to stand in the place of the creditor, and have his securities transferred to him, and to avail himself of those securities against the debtor. This right of the surety stands not upon contract, but upon the same principle of natural justice, upon which one surety is entitled to contribution from another.' (Citing authorities.) I think that this right of preference should be afforded to this subrogee, in conformity to this general rule, and not, in derogation of that rule, be withheld. This prefer-

ence was inherent in the debt. The character of the debt is not affected by the circumstance that it must now be paid to the substitute of the state and not to the state itself. If the debt merely from this circumstance loses this attribute, then he who stands in the shoes of the state loses of the essence of the debt, and he who should in no way be affected by the fact to whom the debt is paid gains from the essence of the debt. There is no equity in such loss or in such gain.''

In *Orem* v. *Wrightson, supra,* the court said:

''As is said in some of the cases to which we have referred, equity in applying the doctrine of subrogation, looks not to form but to the substance and essence of the transaction. It looks to the debt which is to be paid, and not to the hand which may happen to hold it, and will see that the fund charged with its payment shall be so applied. 3 Leigh (Va.), 295.''

See also authorities cited in 37 Cyc., p. 426.

6. Under these well-established principles the plaintiff is clearly entitled to be subrogated to all of the rights, remedies and priorities which the state itself could have asserted against the bank and against its unsecured creditors.

There then remains the sole question of whether the legislature, in prescribing the procedure to be followed by the superintendent of banks in liquidating the liabilities of an insolvent bank, intended to waive or defeat the right of the state to have its claim paid before the payment of claims of general creditors.

7. In deciding this question we think the correct rule to be applied is that announced in *Matter of Niederstein, supra,* that the common-law right of the state to a preference in payment exists unless taken away by some express statutory provision upon the

principle there restated from *Guarantee Co.* v. *Title Guaranty Co.,* 224 U. S. 152 (56 L. Ed. 706, 32 Sup. Ct. Rep. 457), that the "sovereign is not bound by the general language of a statute * * unless specifically mentioned therein."

8. The legislative intent must be gathered from the language of the act, although where the meaning of the words and language employed are ambiguous or of doubtful import, extraneous facts may be considered, not for the purpose of defeating the act, but to aid in its interpretation: *People* v. *Sturges,* 27 App. Div. 387 (50 N. Y. Supp. 5); *Sturgis* v. *Crowninshield,* 4 Wheat. 202 (4 L. Ed. 529, see, also, Rose's U. S. Notes); 2 Lewis' Suth. Stat. Const. (2 ed.), 704; *State* v. *Simon,* 20 Or. 365 (26 Pac. 170).

In order to sustain the right of the state to priority in payment over general creditors of debts due it, it is necessary that those elements shall exist which were essential at common law to uphold the prerogative right of the British Crown. At common law the priority of the British Crown was defeated by a *bona fide* sale of the debtor's property or by a fair assignment to trustees for the benefit of creditors or by an antecedent lien upon the property or by any transaction through which the debtor's title passed to a third party, either absolutely or by way of a lien, but if the debtor's title to the property was not changed or his property therein altered, the priority right of the British Crown was not defeated, even though the goods were *in custodia legis* or had been placed in the possession of a third party; 2 Tidd's Practice, 1053; *Marshall* v. *New York, supra.*

"And when goods are *bona fide* sold, or fairly assigned by the king's debtor to trustees for the benefit of his creditors, before the *teste* of the extent, they

cannot be taken under it, even though the debtor, in the latter case, was a trader within the bankrupt laws, and the assignment was an act of bankruptcy, and void as against the assignees. A factor, to whom goods have been sent for sale, and who has accepted bills of exchange, drawn on him by his principal, to the amount of their value, has a lien on such goods, and the purchase money; which lien is available against the crown, where the goods or money have been seized under an extent against the principal, for a debt due to the crown. So, goods pawned or pledged before the *teste* of an extent, cannot be taken under it; because the pawnee or bailee has a special property in them; nor, for the same reason, goods demised or let to another for a term certain, during the term; but it seems that goods pawned before the *teste* of the extent may be taken, as against the pawnee, on satisfaction of the pledge: and after the extent, a pawnee of goods cannot safely redeliver them to the pawner; for the interest of the latter is bound by the *teste* of the writ.

"The property of goods, though bound, not being altered by a distress for rent, until the goods are actually sold, it has been determined that an extent against the king's debtor, *tested* after a distress taken for rent, with notice to the tenant, and appraisement of the goods, but before sale, shall prevail against the distress. * *

"In the case of an execution, it is a rule, that when the king and a subject stand in equal degree, and the property of the debtor remains unaltered, the king's prerogative must prevail." 2 Tidd's Pr. 1053, 1054.

So far as deemed applicable to the question involved, the statute, by Chapter 3 of Title XXXIV, Or. L., makes it the duty of the state treasurer, who is the custodian of state funds, to designate such banks and trust companies as he may deem eligible as state depositaries, and to keep on deposit in such depositaries at interest at not less than 2 per cent

per annum, payable to the state, certain of the state funds. As security for the repayment on demand of the funds so deposited, it is made the duty of the state treasurer to require all such depositaries, either to deposit securities of the class designated by statute or to give bonds for the repayment of such deposits. Where such securities are pledged with the treasurer as security for the repayment of the funds deposited, and default in the repayment to the state of the money so deposited is made, the treasurer is authorized to dispose of said securities at public or private sale and repay the state from the proceeds derived therefrom, and where bonds are given to secure repayment to the state of the moneys deposited, the statute provides how the bond shall be conditioned and the form thereof, the principal condition being that the bank shall repay the amount of the deposit with interest upon demand on the order or check of the treasurer.

Sections 6221–6223, Or. L., provide that a state bank shall be deemed insolvent when the actual cash market value of its assets are insufficient to pay its liabilities or when it fails to make good its reserve as required by the act. It makes void all transfers, assignments and payments made by the bank with intent to prefer one creditor over another. When the capital stock of the bank is impaired or reduced below the amount required by law, it directs the superintendent of banks to notify the bank to make good such impairment, and upon its failure to do this, it is made the duty of the superintendent of banks to take immediate charge of the affairs of the bank, giving written notice thereof, and to take possession of and administer its assets, convert the same into cash and make distribution thereof. The statute prohibits

the appointment of a receiver or the making of a deed
of assignment by the bank for the benefit of its cred-
itors, except upon notice to the superintendent of
banks, and then only in case of urgent necessity to
preserve the assets of the bank, which appointment
shall be vacated or the assignee removed upon the
application of the superintendent of banks.

The statute further provides that whenever the
claims of depositors and creditors of the bank have
been paid in full by the superintendent of banks and
proper provision for unclaimed or unpaid deposits or
dividends has been made, and all the expenses of the
liquidation have been paid, the superintendent of
banks shall call a meeting of stockholders of the bank
for such stockholders to determine whether the super-
intendent of banks shall complete the liquidation of
the affairs of the bank or the stockholders shall
appoint an agent to complete the liquidation, and if
the stockholders determine to elect an agent, then
the superintendent of banks is required to transfer
to the agent all of the assets of the bank then remain-
ing in his hands, and upon such transfer and delivery
the superintendent of banks is discharged from all
further liability to the bank.

Because of these latter provisions, the defendant
contends that upon the superintendent of banks tak-
ing possession of the assets of an insolvent bank, the
title to the assets of the insolvent bank passes to the
superintendent of banks, and the bank thereby be-
comes divested of its property in the assets of the
bank, and that this operates like a deed of assign-
ment to trustees for the benefit of creditors, at com-
mon law, to defeat the priority right of the state.
Like provisions are to be found in the statutes of the
states of New York and Washington.   Notwithstand-

ing these provisions, the courts of New York hold that the priority of the state is not defeated: *Matter of Carnegie Trust Co., supra; United States Fid. & Guar. Co.* v. *Carnegie Trust Co., supra; United States Fid. & Guar. Co.* v. *Borough Bank, supra.* In the State of Washington it is held that the priority right of the state is defeated in *Commissioners* v. *Chelsea Sav. Bank, supra,* upon the theory that the statute divests the bank of its title and vests the title in the state bank examiner.

Other cases which it is contended bear upon the question here involved are *Freeholders etc.* v. *Bank* (N. J.), *supra; State* v. *First State Bank* (N. M.), *supra; State* v. *People's Bank* (N. M.), *supra; State Bank Commr.* v. *Bank* (Mich.), *supra; Aetna Accident & Liability Co.* (Mont.), *supra; State* v. *Foster* (Wyo.), *supra; National Surety Co.* v. *Pixton,* (Utah), *supra.* In all of these cases a priority right was claimed by or on behalf of the state to moneys of the state deposited in a bank which became insolvent. In the first five cases referred to liquidation of the indebtedness of the insolvent bank was being had by means of a receiver regularly appointed by a court pursuant to the express provisions of a statute directing the appointment of a receiver in cases of insolvent corporations. In the New Jersey case cited, the court, after holding that the State of New Jersey did not possess the common-law prerogative right involved here, said: "That appointment invested him with full power to sell, assign and convey all the property of the corporation (Rev., p. 189, § 72). No act by the corporation is necessary to complete either the title of the receiver or that of his purchaser. Unlike proceedings under bankrupt laws, no assignment by the debtor or commissioners is re-

quired. Title is divested by force of law, and such divesture is perfect and absolute.''

In the two New Mexico cases cited a receiver had been appointed to take charge of and administer the assets of an insolvent bank under a statute which it was held divested the insolvent bank of its title to the assets and vested the title to the same in the receiver by force of the statute.

In the Michigan case cited a receiver had been appointed to liquidate the assets of an insolvent bank. The surety intervened and prayed for an order requiring the receiver to pay the surety the amount it had paid to the state. In effect the court held that whether the state was entitled to a preference, in the absence of a statute, was a question not necessary for decision, and that under the statute of the state the procedure provided for the liquidation of the insolvent bank, in effect, operated as an assignment for the benefit of creditors, saying: ''Without treating the action of the banking commissioner in closing the Chelsea bank as the precise legal equivalent of a fair and *bona fide* assignment by the bank of its assets for a valuable consideration, it is nevertheless true that the proceedings taken passed all the property of the bank beyond its power or control. This, being the result of enforcement of the state law, should have an effect equal to an assignment for benefit of all creditors. Such an assignment could not be avoided by the crown nor could it lay claim to goods seized by the sheriff on *fieri facias* and sold.''

In the case of *Aetna Accident & Liability Co.* v. *Miller, supra,* the plaintiff, a surety, had paid to the State of Montana the amount that the state had on deposit in an insolvent bank of which Miller had been appointed receiver. The court in that case upheld

the right of the state to priority and the right of the surety to be subrogated to the rights and priorities of the state. In answer to the objection that the insolvent bank had been divested of its title to the assets of the bank and the property had passed beyond its control, the court said:

"Equally valueless are the holdings cited to the effect that a receivership divests the title of the owner, for whatever may be the law elsewhere, the rule is different in this state. (Citing cases.) But, it is said, by the receivership the bank lost all control over its assets, and this is sufficient to defeat the preference. It is certainly true that during receivership the owner loses the control of his property, and in receiverships like this such control may never be regained. Yet to regain control is always theoretically possible, for the purpose of any receivership is to husband the property thereby sequestered for whoever may be entitled to it. Nor is it decisive that the receiver may sell, under order of court, because that power is given and may be used only in furtherance of the purpose to husband; so, too, an executor or administrator may sell, yet it cannot be contended that he has title or such control over the real estate of his decedent as would defeat a lawful preference. A receivership and an assignment for the benefit of creditors are two different things. *Babcock* v. *Maxwell,* 21 Mont. 507, 513 (54 Pac. 943). But this court has said that the position of a receiver is no better and no higher than that of an assignee; he occupies a situation not materially different from that of an insolvent prior to the appointment; he is the arm of the court to accomplish, when necessary, the distribution of the assets of the insolvent according to the rights of those entitled thereto. *Williams* v. *Johnson,* 50 Mont. 7 (144 Pac. 768, Ann. Cas. 1916D, 595). This of necessity involves a recognition of the order in which such rights shall come. The present receivership was procured by the state, under its own banking laws, for the protection of itself and other creditors;

it would be a strange result if such a proceeding so brought must operate to impair the right thus sought to be conserved.''

In the instant case the liquidation of the assets of the bank is being made by an officer of the state and not by a receiver appointed by the courts. Hence, the first four of the cases last cited, in the construction which they placed upon their own statutes as to the effect to be given to the appointment of a receiver upon the assets of an insolvent corporation and their ruling that this effect was such that at common law it would have been sufficient to defeat the sovereign right of the British Crown, are not in point, while the Montana case is in point only as to matters to be considered later.

The case of *State* v. *Foster, supra,* is not in point for the reason that in that case the debtor had deeded his property to a trustee for the benefit of all of his creditors, and this, at common law, would have been sufficient to defeat the king's prerogative right.

The case of *National Surety Co.* v. *Pixton, supra,* is squarely in favor of the proposition that the liquidation of an insolvent bank by the commissioner of banks of that state, under the statutes of that state, divests the bank of its title to the assets of the bank and defeats the state's preference right to priority if the state had such right and holds in effect that this would defeat the right of the state to priority if the state has such right because it indicates an intention upon the part of the state to not claim a preferential right as against general creditors for the repayment of state funds deposited in a bank which afterwards becomes insolvent.

As the superintendent of banks is merely an administrative officer of the state charged by statute with

the duty of liquidating the liabilities of an insolvent bank, it would seem that in his taking possession of the assets of such bank, the bank's title to the  assets would not be divested until the assets were sold, and that the dividing line at which the title would pass from the bank would be the time when the sale was made.

In order to defeat the prerogative right of the British Crown to priority in payment of debts due it, as against creditors not having an antecedent lien, it was necessary, as said by Mr. Justice BRANDEIS, in *Marshall* v. *New York, supra,* that the debtor's title to his property should have passed absolutely or by way of lien before the sovereign sought to enforce his right. To thus defeat the prerogative right of the crown the title of necessity had to pass from the debtor to a third party. We know of no principle of the common law which would have defeated this prerogative right, if, before the rights of a third party had attached, the title to the property had passed to the crown instead of to a third party. In fact in the case mentioned by Mr. Tidd of goods pledged to another by the debtor which could be obtained by the king upon payment to the pledgee of the amount for which the goods were pledged when the goods thus came into the possession of the king, his possession would not operate to defeat his prerogative right, but was in aid of it.

9. In the procedure provided by statute for the liquidation of the liabilities of insolvent banks, the superintendent of banks, in the performance of his duties, is merely an administrative officer and agent of the state. He has no authority except that conferred by statute and in the performance of his official duties he merely exercises one of the sovereign powers of

the state under the authority delegated to him by the legislative power of the state. His possession therefore is the possession of the state and he takes such possession merely to secure payment for the creditors out of the assets of the bank according to their rights and priorities. For this reason, it would seem to be anomalous for us to hold that merely because the state takes possession of the property of an insolvent bank for no other purpose than to secure payment to the creditors of the insolvent bank, of whom the state is one, it thereby defeats its right to collect its own debt or to assert any priority the state might possess in the absence of some plain provision of the statute expressly declaring, or necessarily implying a legislative intent, that that result should follow.

We think that our conclusion is in harmony with the rule stated by Mr. Justice Lewis in *Jones* v. *Tatham*, 20 Pa. 398, and quoted with approval in *Booth & Flinn* v. *Miller*, 237 Pa. 297, 305 (85 Atl. 457) that "words of a statute applying to private rights do not affect those of the state. * * The general business of the legislative power is to establish laws for individuals, not for the sovereign; and, when the rights of the commonwealth are to be transferred or affected, the intention must be plainly expressed or necessarily implied."

It is said to be a universally accepted rule "that the sovereign authority is not bound by the general language of a statute which tends to restrain or diminish the powers, rights, or interests of the sovereign: *United States* v. *Herron*, 20 Wall. 251 (22 L. Ed. 275, see, also, Rose's U. S. Notes); *Guaranty T. & T. Co.* v. *Title G. & S. Co.*, 224 U. S. 152, 155

(56 L. Ed. 706, 32 Sup. Ct. Rep. 457.)'' *Aetna Accident & Liability Co.* v. *Miller, supra.*

For these reasons the cause will be remanded with directions to overrule the demurrer to the complaint, and for such further proceedings therein as are not inconsistent herewith.

REVERSED AND REMANDED WITH DIRECTIONS.