## STATE OF OREGON v. INGRAM.

### In re BROWN'S ESTATE.

### No. 6724.

Circuit Court of Appeals, Ninth Circuit.

Feb. 13, 1933.

I. H. Van Winkle, Atty. Gen., and Willis S. Moore, Asst. Atty. Gen., for appellant.

Wm. B. Layton and N. Ray Alber, both of Portland, Or., for appellee.

Before SAWTELLE, Circuit Judge, and NETERER and ST. SURE, District Judges.

ST. SURE, District Judge.

Appeal from an order of the District Court affirming an order of the referee in bankruptcy disallowing a claim of the state of Oregon as a claim entitled to priority and allowing same as a general claim against the estate of the above-named bankrupt.

Rulings of the District Court affirming the order of the referee disallowing the claim and holding that the right of the state was barred by a common-law assignment for the benefit of creditors were assigned as error. Appellee calls attention to the fact that appellant made no assignment of error on the holding of the lower court that the bankruptcy proceeding in itself defeated the claim of priority, and asks that the appeal be denied on that ground alone. As this is a proceeding in equity, and the whole matter in controversy is before us, we shall decide it upon its merits.

The facts, as shown in the findings of the referee, are as follows: On October 3, 1931, the bankrupt made a general assignment for the benefit of all of his creditors. Within four months of the date of said assignment, an involuntary petition in bankruptcy was filed, and adjudication followed. The state, through its agency, the game commission, filed a general claim against the bankrupt's estate in the sum of $1,700 for moneys collected in the year 1930 by the bankrupt from the sale of license fees exacted by state law. A general dividend was paid upon the claim, but later the state amended it and demanded priority of payment over general creditors. The trustee admitted the validity of the claim as a general one, but denied its priority, and he was sustained by the referee.

The state's claim of priority is based upon the common law as construed by its highest court and section 64b of the Bankruptcy Act of 1898, as amended (11 USCA § 104 (b), which reads as follows: "The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be * * * (7) debts owing to any person who by the laws of the States or the United States is entitled to priority: Provided, That the term 'person' as used in

this section shall include corporations, the United States and the several States and Territories of the United States."

█ The decisions of the Supreme Court, the highest court of the state of Oregon, construing the common law, will be accepted by this Court as conclusive. Marshall v. New York, 254 U. S. 380, 385, 41 S. Ct. 143, 144, 65 L. Ed. 315. Both parties rely upon the decision of the Supreme Court of Oregon in the case of United States Fidelity & Guaranty Co. v. Bramwell, 108 Or. 261, 217 P. 332, 32 A. L. R. 829, as supporting their contentions. In the Bramwell Case state funds were deposited in a state bank, which became insolvent. The state superintendent of banks took possession of the assets, property, and business of the insolvent bank, and began liquidating its business in accordance with Oregon laws. The insolvency of the bank and the possession of the state superintendent of banks for the purpose of liquidation, pursuant to statutes of Oregon, did not transfer or change the title to the property. A surety paid to the state the amount of its deposit, and demanded that it be subrogated to the right of the state to priority in payment over general creditors of the bank. Subrogation and priority were allowed.

In its decision the Supreme Court of Oregon says (page 264 of 108 Or., 217 P. 332, 333): "The common law of England, modified and amended by English statutes, as it existed at the time of the American Revolution, as far as it was general and not local in its nature and applicable to the conditions of the people and not incompatible with the nature of our political institutions or in conflict with the Constitution and laws of the United States or of this state, except as modified, changed or repealed by our own statutes, has been adopted and is in force in this state. Peery v. Fletcher, 93 Or. 43, 182 P. 143."

The decision also quotes and adopts (page 267 of 108 Or., 217 P. 332, 334) the following language from the case of Marshall v. New York, supra: "At common law * * * the crown of Great Britain, by virtue of a prerogative right, had priority over all subjects for the payment out of a debtor's property of all debts due it. The priority was effective alike whether the property remained in the hands of the debtor, or had been placed in the possession of a third person, or was in custodia legis. The priority could be defeated or postponed only through the passing of title to the debtor's property, absolutely or by way of lien, before the sovereign sought to enforce his right."

And further, at page 269 of 108 Or., 217 P. 332, 335, the Oregon court says: "The preference right of the state to priority in payment out of the effects of an insolvent debtor is based upon the common law and requires no statute for its support. The existence and enforcement of the right are necessary for the protection of the public revenue. That the right would be of essential importance to the state if both the depositary bank and the surety company should become insolvent is obvious. The right is therefore one that is adapted to the circumstances, conditions, and necessities of the people because essential to sustain the public burdens and discharge the public debts, and unless some provision of statute can be found which clearly evinces a legislative intent to abandon or waive this preference right of the state it is the duty of the courts to preserve rather than to defeat it."

Then follows (pages 280, 281 of 108 Or., 217 P. 332, 339) a quotation from 2 Tidd's Practice, the text of which, in the American Edition of 1856, page 1053, is as follows: "And when goods are bona fide sold, or fairly assigned by the king's debtor to trustees for the benefit of his creditors, before the teste of the extent, they cannot be taken under it, even though the debtor, in the latter case, was a trader within the bankrupt laws, and the assignment was an act of bankruptcy, and void as against the assignees. (k)"

The referee accepts the above statement as "precisely defining the limit upon the prerogative appertaining in this case, in virtue of the assignment made by the bankrupt." The statement is correct when applied to facts like those mentioned in the case cited in Tidd's Practice, footnote "(k)," supra: The King, in aid of Braddock v. Watson and Another, 3 Price 6. In King v. Watson, the question presented for decision was the effect of a common-law assignment made before the property of the debtor and assignor had been seized under the writ of extent necessary to test the prerogative right of the crown to priority. The deed of assignment was dated February 28, 1815. The extent in aid was tested August 21st of the same year. The assignment was not followed by an adjudication in bankruptcy, and the only question presented was its effect upon the prerogative right of the crown. The court of exchequer held that there was "no fraud in this case affecting the assignment, which has

been made for the equal benefit of all the creditors." But that "it would have been a different thing if there had been a commission of bankrupt sued out, and the property had been divested."

The facts in the case at bar are different from those in the case of The King, etc., v. Watson, supra, because here adjudication followed the assignment, the assignee's right of possession of the debtor's property ceased, and the trustee in bankruptcy took title from the bankrupt, not through, nor as the successor of, the assignee. Remington on Bankruptcy (3d Ed.) vol. 5, § 2081.

In Marshall v. New York, supra, it is said that at common law the priority of the British crown "could be defeated or postponed only through the passing of title to the debtor's property, absolutely or by way of lien, before the sovereign sought to enforce his right."

In the case of Giles v. Grover, before the House of Lords, 9 Bing. 128, 131, English Reports (full reprint), page 563, it was decided, after a most elaborate discussion, in conformity with the opinions of a majority of the ten judges, that the goods of a debtor seized under a fieri facias issued upon a judgment at the suit of a subject, but not sold, might be taken under a writ of extent for a debt of the crown, and which writ was tested after the seizure under the fieri facias. In this same case Alderson, J., said that the authorities show "that the king at common law, by his prerogative, could either by one writ, or by successive writs, as he might find it convenient, seize the body, lands, and goods of his debtor: * * * that where the right of the crown and the subject concur, that of the crown is to be preferred (9 Rep. 129b.); a prerogative depending first on the principle that no laches is to be imputed to the king, who is supposed by our law to be so engrossed by public business as not to be able to take care of every private affair relating to his revenue; Gilb. Hist. Exchequer, 110; and, secondly, on the ground that by the king is in reality to be understood the nation at large, to whose interest that of any private individual ought to give way. * * * And until restrained by various enactments of the statute law, this prerogative extended to prevent the other creditors of the King's debtor from suing him, and the King's debtor from making any will of his personal effects without special leave first obtained from the crown. But without further adverting to this ancient state of the prerogative, it is clear that at this day the rule is,

that if the two rights come in conflict, that of the crown is to be preferred.

"If, however, the right of the subject be complete and perfect before that of the king commences, it is manifest that the rule does not apply, for there is no point of time at which the two rights are in conflict; nor can there be a question which of the two ought to prevail in a case where one, that of the subject, has prevailed already. But if whilst the right of the subject is still in progress towards completion, the right of the crown arises, it seems to me that the two rights do come into conflict together at one and the same time, and that the consequence in that case is that the right of the crown ought to prevail. Lord Mansfield expresses this proposition in shorter language when he says, 'No inception of an execution can bar the crown.' (Cooper v. Chitty [1 Burr. 36].)"

It will be remembered that the contention of the appellee is that the priority of the state was defeated by the general assignment for the benefit of creditors. The principle adopted in the Bramwell Case, supra, is that the title to the debtor's property must pass *absolutely* or the state's priority will prevail. (Italics supplied.) The rule contended for by the British Crown and approved by the judges in Giles v. Grover, supra, is that the King by his prerogative has a right to be first served and paid by his debtors, provided his process issues at any time before there is a complete divesting of the property out of the debtor. Scattered through the decision in this leading English case are expressions of the judges such as these: There must be an absolute alteration of the property which can be only by sale. If there is any further act necessary to be done to complete creditors' rights under the assignment, the transaction is not consummate. Until the creditor obtains a consummate right, the Crown's rights are not ousted.

In the case at bar there was a general assignment for the benefit of all creditors which was valid until bankruptcy, according to settled law in both England and America. The question naturally arises, What kind of a title, if any, did the assignee take under the general assignment? At its very inception the transaction was within the pale of the law, as the general assignment was an act of bankruptcy.

"When the assignee takes charge of an assigned estate, he must be charged with knowledge that he is acting under an instrument

which in and of itself constitutes an act of bankruptcy, and that, if bankruptcy proceedings are commenced within four months from the date of the assignment which result in adjudging his assignor a bankrupt, he, as the assignee, merely holds the assigned estate for the use and benefit of the creditors of the bankrupt, and that the bankruptcy court is the court which has the sole right and power to administer the estate." In re Bombino, 44 Utah, 141, 138 P. 1155, 1157.

The assignee in such a case is not an adverse claimant. He may be proceeded against summarily and required to turn over the property of the bankrupt's estate to the trustee. He is merely the agent of the assignor for the distribution of the proceeds of the property, and, as such agent, his possession is that of his principal. In re Stewart (C. C. A.) 179 F. 222, 225. The assignee held the property under no claim of right in himself, and he had no title superior to the bankrupt's estate.

"The general assignment, made by Abraham to Davidson, did not constitute Davidson an assignee for value, but simply made him an agent of Abraham for the distribution of the proceeds of the property among Abraham's creditors." Bryan v. Bernheimer, 181 U. S. 188, 192, 21 S. Ct. 557, 559, 45 L. Ed. 814.

It thus appears that, however the assignee's title may be defined, whether possessory, conditional, or special, under powers of agency, it clearly is not absolute.

When the claim of the state was filed and priority demanded, the general assignment had been avoided by bankruptcy and the estate of the bankrupt was in custodia legis. The right of priority of the state under the provisions of the common law and section 64b of the Bankruptcy Act could then be asserted, as was done. Goods in custodia legis continued liable to the king's extent until the period arrived at which some person, other than the original debtor, had acquired a consummate right in them. Giles v. Grover, supra, at page 577 of 131 English Reports.

▮▮▮ We are of the opinion, under the rule adopted by the Supreme Court of Oregon in the Bramwell Case, supra, that the debtor's title did not pass absolutely by the general assignment, which was automatically avoided by adjudication, and that the state is entitled to the priority claimed; and, further, that the priority of the state was not defeated by the taking over of the property by the bankruptcy court before the state asserted its claim, as the property was then in custodia legis, and the state had the right to assert its priority at any time before some person, other than the debtor, acquired an absolute title.

Reversed.

NETERER, District Judge (concurring).

The state's claim, by virtue of prerogative right, had priority until the title passed *absolutely* before the state sought to assert its right. Peery v. Fletcher, 93 Or. 43, 182 P. 143; U. S. F. & G. Co. v. Bramwell, 108 Or. 261, 217 P. 332, 32 A. L. R. 829; Marshall v. New York, 254 U. S. 380, 41 S. Ct. 143, 65 L. Ed. 315. This is in harmony with Tidd's Practice (all cited in the majority opinion) as follows: "When goods are bona fide sold or fairly assigned." The instant assignment did not transfer the title absolutely. Section 21 (a) 4, (b) 1, title 11, USCA, and section 110, title 11, USCA. The provisions of the Bankruptcy Act became a part of the transaction, creating a debtor and creditor relation, and right and method of procedure, state and federal, to satisfy the creditor claims as though specifically set out in the arrangement. Walker v. Whitehead, 16 Wall. (83 U. S.) 314, 21 L. Ed. 357; Southern Surety Co. v. Oklahoma, 241 U. S. 582, 36 S. Ct. 692, 60 L. Ed. 1187; Farmers' & Merchants' Bank v. Federal Reserve Bank, 262 U. S. 649, 43 S. Ct. 651, 67 L. Ed. 1157, 30 A. L. R. 635. The assignment was *not fair;* title was not free from defect, but was contingent as much as though the assignment had the reservation: "Subject to the provisions of the Bankruptcy Act." The *right* of the assignee, however, *was in progress to make the title absolute,* and but for the *contingency (adjudication in bankruptcy),* title would have been *absolute* four months after the assignment, but "no inception of an execution can bar the Crown." Caspar v. Chitty, 1 Burr. 36 (cited in the majority opinion). Upon adjudication the title, in abeyance, pending contingency, vested in the trustee upon his election and qualification, as of date of adjudication (section 110, title 11, USCA), and the state's priority claim attached.

I don't think the Bramwell Case is in point, except as to declaring the law of the state (applicable to particular facts). The appointment of the receiver did not disturb the title of the debtor, and no contingency would have ripened title in the receiver. The receiver was merely the liquidating agent of the court. Union Bank of Chicago v. Kansas City Bank, 136 U. S. 223, 10 S. Ct. 1013,

34 L. Ed. 341; Nicholson v. Western Loan & Building Co. (C. C. A.) 60 F.(2d) 516. Whether the ripening of the contingent title in the assignee at the end of four months, with no intervening adjudication, would defeat a sovereign's priority right, is not now before the court, and our decision should be restricted to the peculiar facts in this case. I think the rule in the Bramwell Case applicable here is stated too broadly.

I concur in reversal.