Argued October 29, 1951, reargued April 10, affirmed April 16, 1952

## WITHERS ET AL. *v.* REED
### 243 P. 2d 283

*Pat H. Donegan,* of Burns, argued the cause and filed a brief for appellant.

*Leland S. Duncan,* of Burns, argued the cause for respondent. With him on the brief was C. B. McConnell, of Burns.

George Neuner, Attorney General, and E. G. Foxley, Deputy Attorney General, of Salem, filed a brief as amici curiae.

LUSK, J.

The single question for decision on this appeal is whether § 116-437, OCLA, is applicable to the state of Oregon. That section reads:

"Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state, and whenever hereafter the owner of a perfected and developed water right shall cease or fail to use the water appropriated, for a period of five successive years, the right to use shall thereupon cease, and such failure to use shall be conclusively presumed to be an abandonment of such water right, and thereafter the water which was the subject of use under such water right shall revert to the public and become again the subject of appropriation in the manner provided by law, subject to existing priorities; provided, that this act shall not apply to, or affect, the use of water, or rights of use, acquired by cities and towns in this state, by appropriation, or by purchase, for all reasonable and usual municipal purposes; and this act shall not be so construed as to impair any of the rights of such cities and towns to the use of water, whether acquired by appropriation or purchase, or heretofore recognized by act of the legislature, or which may hereafter be acquired; and the right of all cities and towns in this state to acquire rights to the use of the water of natural streams and lakes within this state, not otherwise appropriated, and subject to existing rights, for all reasonable and usual municipal purposes, and for such further reasonable and usual municipal purposes as may reasonably be anticipated by reason of growth of population, or to secure sufficient water supply in cases of emergency, is hereby expressly confirmed."

The case arose in this way. In 1928 Robert C. Lowe was the owner of forty acres of land in Township 22 South of Range 32 East W. M. in Harney County, Oregon, with the right to irrigate such land from the waters of Mill Creek and Coffee Pot Creek. Lowe was a veteran of World War I and mortgaged the land to the World War Veterans State Aid Commission as security for a loan made to him pursuant to the provisions of Art XI-C of the constitution and § 104-110, OCLA. Lowe defaulted, and in 1932 he and his wife conveyed the land to the state in lieu of foreclosure, the note and mortgage being canceled. The state held title to the land until 1945 when it sold it to a predecessor in interest of the contestee and appellant, Ralph E. Reed. During the period of thirteen years of ownership by the state the land was not irrigated, although water was available for that purpose. These facts are stipulated.

The present proceeding was commenced by a complaint filed by the contestants and respondents in the Circuit Court for Harney County, and was referred to the state engineer for an adjudication of the water rights involved. There were other parties to the proceeding, but we are not concerned with them. The controversy, so far as the parties to this appeal are concerned, turned on the question whether the state had forfeited its water right by non-user for a period of more than five years. The state engineer held that the statute applied to the state, that such forfeiture had occurred, and therefore that the contestee, Reed, successor in interest to the state, had no right or interest in the waters of Mill Creek and Coffee Pot Creek. On exception filed by the contestee the circuit court affirmed the state engineer's order of determination in respect of the question before us and

entered a decree accordingly from which the contestee has appealed.

Reed relies upon the principle crystalized in the legal maxim, *nullum tempus occurrit regi.* The general rule is thus stated in 3 Sutherland, Statutory Construction 3d ed, 183, § 6301:

"General words or language of a statute that tends to injuriously encroach upon the affairs of the government receive a strict interpretation favorable to the public, and, in the absence of express provision or necessary implication, the sovereign remains unaffected."

We premise our discussion of the question by stating, what is expressly conceded by the contestants, that the state is the real party in interest with respect to loans made by the World War Veterans State Aid Commission, and that in the administration of the Act, at first through the commission and subsequently through the State Land Board (Oregon Laws 1943, Ch 175), the state was acting, not in a proprietary, but in its sovereign capacity, and that in such capacity it held title to the lands involved and to any funds derived from their sale. *State Land Board v. Lee,* 84 Or 431, 439, 165 P 372. It is manifest, and there is no contention to the contrary, that, since the state is not mentioned in § 116-437, OCLA, the rule, *nullum tempus,* controls our decision unless the case falls within some recognized exception to that rule.

The classic exposition of the doctrine is to be found in the opinion of Mr. Justice Story in *United States v. Hoar,* 2 Mason 311, 313, who wrote:

"The true reason, indeed, why the law has determined, that there can be no negligence or laches imputed to the crown, and, therefore, no delay should bar its right, (though sometimes asserted to be, because the king is always busied for the

public good, and, therefore, has not leisure to assert his right within the times limited to subjects,) is to be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers. And though this is sometimes called a prerogative right, it is in fact nothing more than a reservation or exception, introduced for the public benefit, and equally applicable to all governments. * * *

"But, independently of any doctrine founded on the notion of prerogative, the same construction of statutes of this sort ought to prevail, founded upon the legislative intention. Where the government is not expressly or by necessary implication included, it ought to be clear from the nature of the mischiefs to be redressed, or the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorized to put such an interpretation upon any statute. In general, acts of the legislature are meant to regulate and direct the acts and rights of citizens; and in most cases the reasoning applicable to them applies with very different, and often contrary force to the government itself. It appears to me, therefore, to be a safe rule founded in the principles of the common law, that the general words of a statute ought not to include the government, or affect its rights, unless that construction be clear and indisputable upon the text of the act."

In *Guaranty Trust Co. v. United States,* 304 US 126, 132, 82 L ed 1224, 58 S Ct 785, Mr. Chief Justice (then Mr. Justice) Stone, after quoting from *United States v. Hoar,* said:

"* * * Regardless of the form of government and independently of the royal prerogative once thought sufficient to justify it, the rule is supportable now because its benefit and advantage extend to every citizen, including the defendant, whose plea of laches or limitation it precludes; and its

uniform survival in the United States has been generally accounted for and justified on grounds of policy rather than upon any inherited notions of the personal privilege of the king [citing cases]. So complete has been its acceptance that the implied immunity of the domestic 'sovereign,' state or national, has been universally deemed to be an exception to local statutes of limitations where the government, state or national, is not expressly included; and to the Conformity Act.''

The rule that the statute of limitations does not apply to the state has been several times affirmed by this court. Thus, in *State Land Board v. Lee,* supra, in holding that the statute of limitations relating to mortgages did not bar the State Land Board, in a suit to foreclose a note and mortgage given to the board to secure a loan of money out of the irreducible school fund, the court said (84 Or 434):

''Stated in broad terms, it is a rule of universal recognition that the government is not included in a general statute of limitation unless it is expressly or by necessary implication included. This rule is said to be founded upon the legal fiction expressed in the maxim *nullum tempus occurrit regi.* However, it is not necessary to predicate this salutary precept upon any fiction, since sound reason for the rule is found in the fact that as a matter of public policy it is necessary to preserve public rights, revenues and property from injury and loss by the negligence of public officers.''

See, also, *State v. Warner Valley Stock Co.,* 56 Or 283, 308, 106 P 780, 108 P 861; *Fidelity & Deposit Company of Maryland v. State Bank of Portland,* 117 Or 1, 9, 242 P 823; *Day v. Celoria,* 116 Or 250, 241 P 58. And, upon the principle that ''a sovereign is not bound by the words of a statute unless it is expressly named,'' this court has held that the state is not within the purview of a general law regulating the rate of interest

(*Seton v. Hoyt,* 34 Or 266, 273, 55 P 967, 43 LRA 634, 75 Am St Rep 641), or of a statute giving a priority to tax liens (*State Land Board v. Campbell,* 140 Or 196, 13 P2d 346). Further, it has been held that the state has a preference right to priority in payment out of the effects of an insolvent debtor, this being one of the prerogative rights of the British crown to which the state has succeeded. *United States F. & G. Co. v. Bramwell,* 108 Or 261, 271, 217 P 332, 32 ALR 829; *Fidelity & Deposit Company of Maryland v. State Bank of Portland,* supra.

As to the general rule, there is no dispute between counsel, both of whom have presented the case with ability and commendable candor. They differ on the question whether the case falls within a recognized exception, thus stated in Chitty in his work on Prerogatives of the Crown, page 382:

"The general rule clearly is that, though the King may avail himself of the provisions of any Acts of Parliament, he is not bound by such as do not particularly and expressly mention him. To this rule, however, there is a most important exception, namely, that the King is impliedly bound by statutes passed for the public good; the relief of the poor; the general advancement of learning, religion, and justice; or to prevent fraud, injury or wrong. * * * But Acts of Parliament which would divest or abridge the King of his prerogatives, his interests or his remedies, in the slightest degree, do not in general extend to or bind the King unless there be express words to that effect. * * *

"And in mere indifferent statutes, directing that certain matters shall be performed as therein pointed out, the King is not thereby in many instances prevented from adopting a different course, in pursuance of his prerogative."

The contestants cite *United States v. Hamburg-Amerikanische Packetfahrt Actien Gesellschaft,* 212 F 40 (CA 2d). The question there was whether the United States was bound by the federal statute known as the Limited Liability Act, which provides that the liability of the owner or owners of any vessel for any loss by collision shall in no case exceed the value of the interest of such owner or owners of such vessel and her freight then pending, and that, if the whole of the ship and her freight shall not be sufficient to make compensation to those who suffer the loss, they shall receive compensation in proportion to their respective losses. The United States filed a libel against the owner of a vessel to recover damages caused by the total loss of a number of sacks of mail when the respondent's vessel was sunk in a collision with another vessel. The United States contended that, under the principle here invoked, the act did not apply to the government, and that it could recover the full amount of its loss regardless of a decree previously entered in a proceeding for limitation of liability which provided that all claims not already presented should be forever barred. The United States had made no claim and filed no suit within the period fixed by the court.

The Circuit Court of Appeals, after quoting the statement from Chitty above set out and after reference to other authorities which enunciate the same exception to the general rule, held that the statute bound the government notwithstanding the government was not named; that it came within the exception, since it was a statute, the primary purpose of which was "the promotion of the general welfare of the nation by giving encouragement to capital to invest in the building and navigating of ships so that the commerce of

the United States might be developed." The court said:

"* * * If the public purpose is clear, the legislative intention is not to be defeated by the fact that the immediate benefit may be private and individual. * * * The controlling motive of the enactments was the general good of the country as a whole." (212 F 47)

The court distinguished the Limited Liability Act from ordinary statutes of limitation, which were said to be "for the benefit and repose of individuals and not to secure general objects of policy and morals." It referred to the fact that in *United States v. Hoar* Mr. Justice Story "repudiated the idea that the exemption of the government from the operation of statutes of limitation rested in the notion of the prerogative." The court said: "He based it on the principle of the preservation of the public rights from loss by the negligence of public officers." Any other construction than the one placed on the Act by the court, it was said, "would greatly diminish the value and efficiency of the act and largely defeat what we conceive to have been the intention of the lawmaking body of the nation."

In The Florida, 212 F 334 (DC SDNY), United States District Judge Hough likewise held that the Limited Liability Act was for the benefit of commerce and therefore for the public benefit, and that it bound the United States. After a reference to the authorities, he said:

"It therefore becomes necessary under the guidance of the highest court to examine any statute of limitations, whether the limitation be a contraction of time or a restriction of rights, to ascertain whether that statute is obnoxious not to the prerogative or power of republican governments either state or national, but whether the restriction of the

statute is for the public good when applied to that sovereignty which is the embodiment of the people's power.''

He concluded:

''In this litigation it is neither shown nor suggested that the government in accepting its pro rata share of the proceeds of the Florida is suffering from the negligence or default of any of its officers or employes. The claim made (viewed from the standpoint of declaring the act inapplicable to the government) clearly rests upon prerogative only, and that ground for such a position has in my judgment never been adopted by any American court.''

The opinions in these two federal cases both cite *Fink v. O'Neil,* 106 US 272, 27 L ed 196, 1 S Ct 325, which holds that a statute of Wisconsin, which exempted a homestead from sale on execution, applied to an execution issued upon a judgment in favor of the United States in a federal court. The court said that undoubtedly it would be held by the courts of the state that the state would be bound by the exemption, and held that the United States, by an appropriate legislative act, had adopted the law of Wisconsin creating the exemption. The court quoted from *United States v. Knight,* 39 US 301, 10 L ed 465, in which it was said respecting the maxim *nullum tempus*: ''The real ground is a great principle of public policy, which belongs alike to all governments, that the public interest should not be prejudiced by the negligence of public officers, to whose care they are confided,'' and that when a statute ''which proposes only to regulate the mode of proceeding in suits, does not divest the public of any right, does not violate any principle of public policy; but on the contrary, makes provisions in accordance with the policy which the government has indicated by many acts of previous legislation, to conform to

state laws, in giving to persons imprisoned under their execution, the privilege of jail-limits; we shall best carry into effect the legislative intent, by construing the executions at the suit of the United States, to be embraced within the act of 1828."

The opinion concludes:

"In the *Magdalen College Case,* 11 Coke, 66 *b, Lord* Coke, referring to *Lord Berkeley's Case,* Plowd., 246, declares that it was there held that the King was bound by the Statute *De Donis,* 13 Edw. I., because, for other reasons, 'It was an Act of preservation of the possession of noblemen, gentlemen and others,' and 'the said Act,' he continues, 'shall not bind the King only, where he took an estate in his natural capacity, as to him and the heirs male of his body, but also when he claims an inheritance as King by his prerogative.' By parity of reasoning, based on the declared public policy of States, where the People are the Sovereign, laws which are Acts of preservation of the home of the family, exclude the supposition of any adverse public interest, because none can be thought hostile to that, and the case is brought within the humane exception that identifies the public good with the private right, and declares 'That general statutes, which provide necessary and profitable remedy for the maintenance of religion, the advancement of good learning and for the relief of the poor, shall be extended generally according to their words;' for civilization has no promise that is not nourished in the bosom of the secure and well ordered household."

It will be seen that one of the grounds of the decision was that the law was passed "for the relief of the poor." Like the Hamburg-Amerikanische case and the case of The Florida, it falls within Chitty's exception of "statutes passed for the public good."

The rules of construction in cases of this kind are

thus summarized by an eminent authority on statutory interpretation:

"* * * It follows that not only the divesting or not divesting of any public right is to be regarded, but also the violation of principles of public policy. The test, therefore, in every case in which the question whether or not the government is included in the language of a statute has to be met and determined, cannot be a mere general rule, either one way or another, arbitrarily applied, but must be the object of the enactment, the purposes it is to serve, the mischiefs it is to remedy, and the consequences that are to follow,—starting with the fair and natural presumption that, primarily, the Legislature intended to legislate upon the rights and affairs of individuals only. This is the only proper extent and application of the rule against inclusion of government." Endlich on Interpretation of Statutes 232, § 167.

The contestants call our attention to the cases of *State ex rel. v. Peoples West Coast Hydro-Electric Corp.*, 129 Or 475, 479, 278 P 583, and *State ex rel. v. Hawk*, 105 Or 319, 334, 208 P 709, which are said to be authority for the view that the water code is generally applicable to state departments and commissions. The former of these cases was a condemnation proceeding by the state upon the relation of the state board of fish and game commissioners, commenced for the purpose of condemning certain land in Hood River County for use in connection with propagation, hatching and feeding of salmon and other food fishes. In order to use the land for the purposes intended it would have become necessary to interfere with the water of Herman Creek.

In 1915 the legislature passed an act (ch 36, General Laws of Oregon 1915), which provides:

"Section 1. The following streams and waters thereof forming waterfalls in view of, or near, the

Columbia River Highway, from Sandy River to Hood River, are herewith withdrawn from appropriation or condemnation, and shall not be diverted or interrupted for any purpose whatsoever, except as hereinafter mentioned, to-wit [naming certain streams, including Herman Creek, in Hood River County].

"Section 2. This Act shall not prevent the condemnation for public park purposes of any lands through which any of said streams flow, nor affect vested rights or the rights of riparian proprietors of such lands in, or to the waters of said creeks or streams."

The court held that this act was a plain revocation of authority for the condemnation of land in connection with or bordering upon the streams mentioned in the act, and reversed a judgment in favor of the plaintiff.

In 1921 § 2 of the act of 1915 was amended by ch 373, General Laws of Oregon 1921, so as to read as follows:

"This act shall not prevent the condemnation for public park purposes of any lands through which any of said streams flow, nor effect [affect] vested rights or the rights of riparian proprietors of such lands in or to the waters of said creeks or streams, nor shall it prevent the condemnation of any lands through which any of said streams flow, for the purpose of establishing, maintaining and operating thereon salmon fish culture work, nor shall this act prevent the fish commission of the state of Oregon from appropriating any of said waters for fish culture work; provided, however, that no waters shall be taken from above the falls in the streams mentioned in section 7113 of Oregon Laws."

At the same session of the legislature at which the 1915 act was amended in the manner above stated,

there was also enacted what is now § 83-204, OCLA [Oregon Laws 1921, ch 105, § 5 (c)], which gave the fish commission "full power and authority to use so much of the state funds under its control as may be necessary for the acquisition of land, *water rights* and easements and other property" (italics added).

The 1915 act, as thus amended in 1921, now comprises §§ 116-469 and 116-470, OCLA. After the amendment, in the case of *State ex rel. v. Peoples West Coast Hydro-Electric Corp.,* supra, the state sued to enjoin the defendant from diverting the waters of Herman Creek. The question was one of priority of rights as between the parties to the suit. The court in its discussion of the claim of the state said:

"* * * Although the state made use of the waters of Herman Creek in the operation of its hatchery for the first time in 1915 and has continuously used the same since said time, it acquired no right to the water by appropriation because by an act of the legislative assembly, Chapter 36, Laws of 1915, now Sections 7113 and 7114, Or. L., the waters of certain streams flowing into the Columbia River, including Herman Creek, were withdrawn from appropriation and this prohibition was held to be applicable to the State Fish Commission in State ex rel. v. Hawk, 105 Or. 319 (208 Pac. 709, 209 Pac. 607). This bar of the statute against the State Fish Commission was withdrawn by Chapter 373, Laws of 1921, but no application was made by the State Fish Commission for a permit to appropriate such waters until November 15, 1922, when a permit was granted to the State Fish Commission by the State Engineer to make such appropriation. Because of these facts, it was admitted upon the argument that the state had acquired no legal right by appropriation to the waters of Herman Creek until November 15, 1922."

In two respects these decisions have a bearing on the present question. They afford, first, an illustration of a statute drawn in general terms which did not mention the state, but which was held nevertheless to bind the state. The rule of state immunity from general legislation was not discussed either in the briefs or in the opinion of the court in the Hawk case. Nevertheless, the decision that the legislative prohibition against the condemnation and appropriation of the waters of Herman Creek applied to the state, necessarily must be regarded as a holding that the statute fell within some exception to the general rule. Second, these decisions further indicate that, when a state agency exercising a power granted to it by the legislature, undertakes to appropriate any of the waters of the state, it must do so pursuant to the provisions of the water code, and that in a controversy with a private owner of water the state is subject to the same rules of law that govern the rights of the private litigant. And, while it is true that there is probably now no statute under which the state may appropriate water for irrigation purposes, it is also true that the state may, as in this instance, become the owner of an appropriated water right by succeeding to ownership of the land to which the water right is appurtenant. It is that kind of a case with which we are dealing.

Effort is made to distinguish the statute construed in the Hawk case from the statute with which we are here concerned by reference to the language of the former, the prohibition of which is said to be all inclusive. But so is the language of § 116-437, OCLA. No more comprehensive terms could have been employed than "Beneficial use shall be the basis, the measure and the limit of *all* rights to the use of water in this state." Generally speaking, however, argument of this

sort is beside the point, because the question whether the state is exempted from the application of a statute by reason of the rule *nullum tempus* can only arise when the language of the statute is broad enough to include the state. It then becomes a matter of judicial interpretation, under the principles heretofore discussed, to determine whether or not that rule is to be applied.

The argument that irrigation districts might lose their water rights for nonuser, if the statute in question should be held applicable to the state, is entirely beside the point. An irrigation district is a quasi-municipal corporation. *Central Pacific Co. v. Ager,* 144 Or 527, 533, 25 P2d 927. It is not the state, nor an agency of the state in the same sense as the State Land Board is an agency of the state. Were we called upon to determine whether irrigation districts are bound by the provisions of § 116-437, OCLA, we would not be in the least concerned with the maxim, *nullum tempus,* which applies only to the sovereign, but with very different considerations, such, for example, as the purposes which irrigation districts are intended to serve under the statute which authorizes their creation.

The problem here is to determine whether the statute of this state under which a water right is lost by failure to put the water to beneficial use for a period of five successive years was passed for the public good in the sense of those words as they relate to the present subject. We may agree with counsel for the contestee that, for certain purposes, all laws are presumed to have been passed ''for the public good''; but we do not agree that the sort of legislation referred to in this phrase is limited by the words which follow it in the passage quoted from Chitty, to wit: ''the relief of the poor; the general advancement of learning, religion,.

and justice; or to prevent fraud, injury or wrong."
These are examples of laws passed for the public good;
they do not exclude all others. The determinative factor
is whether "the controlling motive" of the statute is
the general good of the state. As the court said in
the Hamburg-Amerikanische case: "If the public pur-
pose is clear, the legislative intention is not to be
defeated by the fact that the immediate benefit may
be private and individual."

In the opening phrase of the statute, "Beneficial
use shall be the basis, the measure and the limit of all
rights to the use of water in this state," the legis-
lature has declared the policy which inspired its enact-
ment. This, we think, was to promote the prosperity
and welfare of the state by encouraging the use of
water and keeping its waste to a minimum. It is the
policy recognized by this court when it said in *In re
Waters of Deschutes River,* 134 Or 623, 666, 286 P 563,
294 P 1049: "Water is too precious an article in the
arid region, or semi-arid region, to be permitted to run
to waste." It is scarcely necessary to elaborate upon
a theme so familiar to the people of this region; yet
it may not be amiss to remind ourselves of the im-
portant part which water has played in the develop-
ment of the Far Western country, and continues to
play in the maintenance of its welfare, by quoting from
the opinion of Mr. Justice Sutherland, himself a
product of the state of Utah, in the case of *California
Oregon Power Co. v. Beaver Portland Cement Co.,* 295
US 142, 156, 79 L ed 1356, 55 S Ct 725. Speaking there
of the construction to be given to the Desert Land Act
of 1877, he wrote:

"For the light which it will reflect upon the
meaning and scope of that provision and its bear-
ing upon the present question, it is well to pause

at this point to consider the then-existing situation with respect to land and water rights in the states and territories named. These states and territories comprised the western third of the United States —a vast empire in extent, but still sparsely settled. From a line east of the Rocky Mountains almost to the Pacific Ocean, and from the Canadian border to the boundary of Mexico—an area greater than that of the original thirteen states—the lands capable of redemption, in the main, constituted a desert, impossible of agricultural use without artificial irrigation.

"In the beginning, the task of reclaiming this area was left to the unaided efforts of the people who found their way by painful effort to its inhospitable solitudes. These western pioneers, emulating the spirit of so many others who had gone before them in similar ventures, faced the difficult problem of wresting a living and creating homes from the raw elements about them, and threw down the gage of battle to the forces of nature. With imperfect tools, they built dams, excavated canals, constructed ditches, plowed and cultivated the soil, and transformed dry and desolate lands into green fields and leafy orchards. In the success of that effort, the general government itself was greatly concerned —not only because, as owner, it was charged through Congress with the duty of disposing of the lands, but because the settlement and development of the country in which the lands lay was highly desirable."

Under the statute in question, failure of "the owner of a perfected and developed water right" to use the water appropriated for a period of five successive years works a forfeiture of the right, not for the benefit of any individual as in the case of an ordinary statute of limitations—which this is not—but for the benefit of the public, to the end that the "water right shall revert to the public and become again the

subject of appropriation in the manner provided by law." Here again, is a statement as clear as words can make it of the public policy behind the statute. Cities and towns are excepted, and special provision made for them in view of their need to anticipate their supplies of water because of growth of population. The state is not mentioned. Ordinarily, this omission would be without significance and the presumption would be applied that "acts of the legislature are meant to regulate and direct the acts and rights of citizens." *United States v. Hoar,* supra. But, in view of the decisions in *State ex rel. v. Peoples West Coast Hydro-Electric Corp.* and *State ex rel. v. Hawk,* and the purpose of the legislation, we think that it must be held to apply to the state. The waste of water by failure of an agency of the state to put it to beneficial use is no less an injury to the common good than a similar waste by a private individual. The terms of § 116-437, OCLA, constituted a condition of the right held by the state's predecessor in interest, Robert C. Lowe; and, when the state succeeded to his ownership of the land and its appurtenant water right, it took it burdened with the obligation which the statute imposes and subject to the loss of the right should the obligation not be fulfilled. The state acquired, and could only acquire, what Lowe himself owned. And it became owner of the water right, not in its capacity as trustee for the public, but in a special capacity incident to the discharge of its duties, through one of its agencies, under the World War Veterans State Aid Act.

It is true that, under the construction we place upon this act, the state may on occasion lose a portion of the public revenue by failure of its officers to use the right during the statutory period. But "not only the divesting or not divesting of any public right is

to be regarded, but also the violation of principles of public policy." Endlich, op. cit. Here the public policy is manifest, and any other construction would tend to diminish the value of the act and to defeat what we conceive to be the intention of the legislature. *United States v. Hamburg-Amerikanische Packetfahrt Actien Gesellschaft,* supra.

Our conclusion accords with an opinion of the attorney general, rendered at the request of Charles E. Stricklin, secretary of the State Reclamation Commission and state engineer, under date of September 9, 1942 (Biennial Reports and Opinions of the Attorney General 1942-1944, p. 48). Presumably the state officials charged with the responsibility of administering the Water Code have acted upon that opinion, thus bringing to the support of the view we take the added weight of administrative construction.

Prior to the reargument the attorney general, at the request of the court, prepared and filed a brief amicus curiae. For the aid thus given us by the attorney general and his deputy the court desires to express its appreciation.

The decree is affirmed without costs or disbursements to any of the parties.

## HAY, J., SPECIALLY CONCURRING.

I concur in the majority opinion by Mr. Justice LUSK. In doing so I rely expressly upon his conclusion that the statute (§ 116-437, OCLA) which effects loss of a water right by a failure of the owner thereof to put it to a beneficial use for a period of five successive years, is applicable to the state, such statute obviously having been passed for the general public good and being expressive of the public policy of the state in

relation to the use of the public waters. The legislature, in adopting that statute, gave particular recognition, it seems to me, to the tremendous importance which it attached to the conservation of such waters by encouraging their beneficial use and discouraging their nonuse.

It is to be remembered that in the present case the state, for 13 consecutive years, absolutely failed to make any application of the waters in question to a beneficial use. Five years' nonuse bars all rights under the statute. To say that, after nonuse of the water for 13 years, the state may assert an absolute right thereto as against an intervening appropriator, is tantamount to saying that the statute may never be invoked against the state. Even in England the rule is not so absolute, for there such a statute may not be pleaded by the Crown after sixty years. 3 Bl. Com. 307; Crown Suits Act, 1769, 9 Geo. III, c. 16, as amended by Crown Suits Act, 1861, 24 and 25 Vict. c. 62.

However, I take the position that in any event the maxim, *nullum tempus occurrit regi,* has no application to the case at bar. Section 116-437, OCLA, is not a statute of limitation but one of forfeiture. A statute of limitation affects only the remedy, not the right; whereas the statute under consideration forfeits the very right itself.

Courts of equity, even where laches is not pleaded, may withhold relief from those who for an unreasonable time have delayed the assertion of their claims. *Willard v. Wood,* 164 US 502, 17 S Ct 176, 41 L ed 531. Laches has been defined as "The neglect to do what in law should have been done, for an unreasonable and unexplained length of time and under circumstances permitting diligence." *Babb v. Sullivan,* 43 SC 436, 21 SE 277. It has been well said that "reasonable

diligence is essential to call into action the powers of a court of equity." 19 Am Jur 339, Equity, § 490.

The doctrine that laches is imputable against the state is one to which this court has long been committed. *State v. Warner Valley Stock Co.,* 56 Or 283, 304, 106 P 780, 108 P 861; *State v. Hyde,* 88 Or 1, 40, 169 P 757, 171 P 582; *State ex rel. v. School District No. 9,* 148 Or 273, 287, 31 P2d 751, 36 P2d 179; *State ex rel. v. School District No. 23,* 179 Or 441, 461, 172 P2d 655.

The public interest in cases like the present is made evident when one considers that, in semi-arid regions, failure to irrigate will result in the reversion of meadow land to desert. But if another appropriator puts the abandoned water to beneficial use in the irrigation of his land, the desert becomes meadow, and, in place of a deserted and abandoned homestead, a new homestead comes into existence. A highly desirable public policy has thus been subserved; it is not exactly waste of water, but waste of land that is involved; and it seems to me that the assertion of old and abandoned rights, even by the state, in such circumstances is and should be against public policy and barred by laches.

"Although statutes of limitation do not run against the government, yet the staleness of the claim may be taken into consideration in determining the question whether a court of equity should interfere and grant relief when the United States, as well as a natural person is a complainant. When the United States comes into a court of equity as a suitor, it is subject to the defenses peculiar to that court." *United States v. White,* 17 F 561, 565, quoted with approval in *State v. Hyde, supra,* 88 Or 1, 40, 169 P 757, 171 P 582.

*Vigilantibus ac non dormientibus jura subveniunt.* In my opinion, the state was barred by lack of diligence in the premises from asserting any rights to the use of the water in question, and its grantee is in no better position.

## TOOZE, J., DISSENTING.

I am unable to agree with the result reached in the opinion of the court. Under the authorities cited and quoted from in that opinion, I feel that the conclusion is inescapable that the state should not, by implication, be deemed to be bound by the provisions of § 116-437; OCLA.

The court in its opinion directs attention to two decisions of this court: *State ex rel. v. Peoples West Coast Hydro-Electric Corp.,* 129 Or 475, 479, 278 P 583, and *State ex rel. v. Hawk,* 105 Or 319, 334, 208 P 709. As to those decisions, the court says:

"In two respects these decisions have a bearing on the present question. They afford, first, an illustraction of a statute drawn in general terms *which did not mention the state,* but which was held nevertheless to bind the state. The rule of state immunity from general legislation was not discussed either in the briefs or in the opinion of the court in the Hawk case. Nevertheless, *the decision that the legislative prohibition* against the condemnation and appropriation of the waters of Herman Creek *applied to the state,* necessarily *must be regarded as a holding that the statute fell within some exception to the general rule.* Second, these decisions further indicate that, when a state agency exercising a power granted to it by the legislature, undertakes to appropriate any of the waters of the state, it must do so pursuant to the provisions of the water code, and that in a controversy with a private owner of water the state is subject to the same

rules of law that govern the rights of the private litigant. (Italics added.)

An examination of those decisions in the light of other legislation dealing with the use of water in this state convinces me that they do not support the conclusions reached by the court. It is true that some state agencies, in appropriating water, are required to follow the same procedure and, in general, are bound by the same regulations as are applied to individuals and private corporations. But this is by force of the specific words of the statute, and not by implication, nor because of court interpretation.

At the time the Hawk case was commenced (1919), what is now § 12-302, OCLA (§ 7089, Oregon Laws), in part provided:

"Whenever it is necessary that the state of Oregon shall require any real property, water, watercourses, and water and riparian rights, or any right or interest therein, for any public use, * * * he [the attorney general] shall * * * commence and prosecute in any court of competent jurisdiction, in the name of the state of Oregon, any necessary or appropriate suit, action or proceeding for the condemnation of said * * * water, watercourses, water and riparian rights so required for said purposes * * *."

This section is now a part of ch. 3, title 12, OCLA, relating to the exercise of the right of eminent domain by the state, counties, and municipalities. It was first adopted in 1905: ch 45, Oregon Laws 1905. Section 12-304, OCLA (§ 7091, Oregon Laws), relates to counties and municipalities.

Section 12-302, OCLA, authorizing condemnation of water rights by the state, contains no provision for

the appropriation of waters under the appropriation laws.

As pointed out in the court's opinion, in 1915 the legislative assembly adopted ch 36, Oregon Laws 1915, the first section of which act became § 7113, Oregon Laws (now § 116-469, OCLA), and the second section of which became § 7114, Oregon Laws (now § 116-470, OCLA). For the purpose of emphasis, I again quote that statute in part:

"The following streams and waters thereof forming waterfalls in view of, or near, the Columbia River Highway, from Sandy River to Hood River, are hereby withdrawn from appropriation *or condemnation,* and shall not be diverted or interrupted *for any purpose whatsover,* except as hereinafter mentioned, to-wit: * * * Herman Creek. * * * All in Hood River County." (Italics added.)

All of the creeks mentioned in said act flowed in the vicinity of the Columbia river highway, one of the most scenic highways in the world. This highway is a mecca for tourists, as well as for our own citizens. Preservation of its scenic beauty is a matter of high importance to the state. That was the purpose of the act in question.

It will be observed that this statute expressly prohibited the exercise of the right of eminent domain insofar as the waters of Herman creek were concerned, no matter who was attempting to condemn. It was an express limitation upon the power vested in the state, counties, and municipalities by the provisions of §§ 7089 and 7091, Oregon Laws, and in other public and quasi-public corporations by similar statutes. It was just as unnecessary to specifically name the state in this prohibitory statute as it was to name counties, municipalities, or quasi-public corporations. It was unneces-

sary because the words of the statute are all-inclusive. The waters of Herman creek were "withdrawn from appropriation *or condemnation * * * for any purpose whatsoever.*" (Italics added.) Those words, when considered in the light of the high purpose of the act, certainly are broad enough to not only include the state, but also all other public and quasi-public corporations enjoying the right of eminent domain, and to prohibit appropriation as well as condemnation.

As pointed out in the Hawk decision, though "the power of eminent domain is inherent in the state, yet it lies dormant until called into existence by express legislative authority." Section 7089, Oregon Laws, was the legislative authority granted for the exercise of the right by the state, and § 7113, Oregon Laws, was the legislative limitation placed upon such right.

In this connection, it is pertinent to note the provisions of § 7114, Oregon Laws, as they read at the time of the Hawk case decision:

"This act shall not prevent the condemnation for public park purposes of any lands through which any of said streams flow, nor affect vested rights or the rights of riparian proprietors of such lands in, or to the waters of said creeks or streams."

Outside of incorporated cities and towns, the establishment of public parks is largely, if not wholly, a state function. To enhance the beauty of, and interest in, the Columbia river highway, the state established public parks along the same, with running waters highly important appurtenances thereto. The exception written into this act of 1915 was an exception to § 7113, Oregon Laws, and its blanket prohibition. Its

sole purpose was to retain the right of the state and its agencies to appropriate and condemn for park purposes, thus indicating clearly that it was intended that § 7113, Oregon Laws, should apply to the state as well as to all others. Otherwise, the exception would not have been necessary.

The gist of the court's opinion in the Hawk case is to be found at page 334, as follows:

"It seems to us that the act of 1915 [§ 7113, Oregon Laws], is a plain revocation of authority for the condemnation of land in connection with, or bordering upon the streams mentioned in the act. * * * The statute [§ 7089, Oregon Laws] did not authorize this condemnation proceeding."

In 1921 the legislature amended § 7114, Oregon Laws, to read as it now appears in § 116-470, OCLA, to-wit:

"This act shall not prevent the condemnation for public park purposes of any lands through which any of said streams flow, *nor effect* [*affect*] *vested rights or the rights of riparian proprietors* of such lands *in or to the waters of said creeks or streams, nor shall it prevent the condemnation of any lands* through which any of said streams flow, *for the purpose of establishing, maintaining and operating thereon salmon fish* culture work, nor shall this act prevent the fish commission of the state of Oregon from *appropriating any of said waters for fish culture work*; provided, however, that no waters shall be taken from above the falls in the streams mentioned in section 7113 of Oregon Laws." Chapter 373, Oregon Laws 1921. (Italics added.)

It is perfectly obvious that this amendment was adopted to meet the objections sustained in the Hawk case. Manifestly, its purpose was to restore to the

state of Oregon through its fish commission the right of eminent domain in the respects particularly mentioned, such right to be exercised under and pursuant to the provisions of what was then § 7089, Oregon Laws. Furthermore, the exception contained in this 1921 act respecting waters above the falls in the streams mentioned in § 7113, Oregon Laws, shows conclusively that the purpose of the 1915 act was that as stated above.

Moreover, the language used respecting the right of the fish commission to *appropriate* waters for fish culture work clearly indicates an intent on the part of the legislature to subject the fish commission to the provisions of the water code regarding appropriations of water. Condemnation as respects water rights is one thing; *appropriation,* as a rule, is another. By this act, vested rights are protected. Under its power of eminent domain, the state, through its fish commission, might take over vested water rights, but it is clear that it could not destroy them by mere *appropriation.*

This court recognized that in the case of *State ex rel. v. Peoples West Coast Hydro-Electric Corp.,* supra, when, at page 479 of the opinion, it said:

"* * * This bar of the statute against the State Fish Commission [ch. 36, Oregon Laws 1915] was withdrawn by Chapter 373, Laws of 1921, but no application was made by the State Fish Commission for a permit to appropriate such waters until November 14, 1922, when a permit was granted to the State Fish Commission by the State Engineer to make such appropriation. Because of these facts, it was admitted upon the argument that the state had acquired no legal right by appropriation to the waters of Herman Creek until November 15, 1922."

Following the adoption of the 1921 amendment, another condemnation proceeding came before this court, involving the waters of Herman creek: *State v. Mohler et al.,* 115 Or 562, 237 P 690, 239 P 193. This action was instituted by the state of Oregon on the relation of its fish commission. The court commented upon the prior decision in the Hawk case and the subsequent enactment of the 1921 law. At page 571, we said:

"It will be observed that prior to the amendatory act, land through which said streams flowed could be appropriated for public park purposes only. The legislature, in its session of 1921, undertook to vest power in the fish commission to appropriate such land for 'salmon fish culture work.'"

In the Mohler case the right of the state to condemn was upheld.

In *State ex rel. v. Peoples West Coast Hydro-Electric Corp.* supra, the use of the waters of Herman creek was again in dispute, but the question involved was entirely foreign to the legal problem presented in the other two decisions just commented upon. In this latter case, a question of priority of use was in issue. The suit was instituted by the state of Oregon on relation of the fish commission to restrain the diversion of waters of Herman creek by defendant. The record disclosed that defendant had appropriated, through its predecessor in interest, the use of a certain quantity of the waters of Herman creek for power purposes before the fish commission had acquired any legal rights in and to such waters, or any part thereof. The rights of defendant had become vested, subject to being defeated only by non-user. The only way the state could acquire or prevent the use of such vested rights was by condemnation proceedings under its power of eminent domain.

However, in its decision the court did, at page 479, make the following statement:

"* * * Although the state made use of the waters of Herman Creek in the operation of its hatchery for the first time in 1915 and has continuously used the same since said time, it acquired no right to the water by appropriation because by an act of the legislative assembly, Chapter 36, Laws of 1915, now Sections 7113 and 7114, Or. L., the waters of certain streams flowing into the Columbia River, including Herman Creek, were withdrawn from appropriation and this prohibition was held to be applicable to the State Fish Commission in State ex rel. v. Hawk, 105 Or. 319 (208 Pac. 709, 209 Pac. 607)."

This statement must be read and considered only in the light of the issue then before the court. When we bear in mind the history and purposes of the legislation respecting these matters, and the all-inclusive words used, it certainly cannot be properly maintained that "the decision that the legislative prohibition against the condemnation and appropriation of the waters of Herman Creek applied to the state, *necessarily must be regarded as a holding that the statute fell within some exception to the general rule.*" (Italics added.) Clearly, the state was not included within the prohibition by implication only; no more so than all other persons and corporations, public or private.

There is no just comparison between the direct and all-inclusive prohibition contained in § 7113, Oregon Laws, and the provision of § 116-437, OCLA, reading as follows: "Beneficial use shall be the basis, the measure and limit of all rights to the use of water in this state", when this latter provision is considered in the light of the legislation of which it is a part, and, in particular, in the light of its purpose. It must be

borne in mind that § 116-437, OCLA, is a part of the general law which largely relates to the appropriation of waters by private persons and corporations. It is those appropriators to whom the act refers and applies. Its purpose is to see that these appropriators make beneficial and continual use of the waters, at the risk of forfeiting their right to others for non-user. The state, in its sovereign capacity, and as distinguished from agencies which it has created, neither appropriates nor uses waters of the state for any purpose. The importance of this observation will later be developed.

An examination of our statutes discloses quite clearly that, in every instance where the state has been interested in the use or control of water, the legislature has adopted specific laws in relation thereto. Different agencies have been created, and necessary powers of condemnation and appropriation have been vested in them. Legislation respecting the Fish and Game Commission is only one illustration of this. Other examples relate to (1) Drainage and Flood Control, title 117, OCLA; (2) Water Projects, title 118, OCLA; (3) Power Projects, title 119, OCLA; (4) Irrigation Projects, title 120, OCLA; (5) Drainage and Diking Districts, title 123, OCLA; (6) Flood Control Districts, title 124, OCLA; and (7) Irrigation Districts, title 125, OCLA. In other words, insofar as the state's connection with water matters is concerned, the legislature left nothing to imagination or implication; it was specific.

On the other hand, it is to be observed that, in the laws relating to loans to war veterans, no authority is vested in the state agencies authorized to administer the provisions thereof, to acquire by condemnation or *appropriation* any waters or watercourses of the state

for irrigation purposes, or otherwise. Art. XI-C, Oregon Const.; ch 1, art 1 to 5, incl., title 104, OCLA; in general, title 106, OCLA, relating to the State Land Board, and, in particular, § 106-201, OCLA, relating to specific powers of the State Land Board.

In making loans to veterans, no discretion is vested in the state except as to determination of the appraised value of the property offered as security and a few other matters not material to this discussion. The state acted strictly in its governmental capacity pursuant to constitutional mandate. Upon default in repayment of the loan, it was forced by the law to foreclose the mortgage or accept a deed to the land. In such circumstances it is not to be implied that the legislature intended the state should lose a water right appurtenant to land it was compelled to accept as security for a loan, the water right perhaps forming the principal value of the land, and without which the land would be practically valueless. What is said respecting veterans' loans applies with equal, if not greater, force to loans by the State Land Board of school funds. Is the irreducible school fund to suffer loss for non-user by the State Land Board of a water right appurtenant to land it has been forced to acquire title to on foreclosure proceedings?

I think it here appropriate to again invite attention to a case cited and quoted from in the opinion of the court: *State Land Board v. Lee,* 84 Or 431, 434, 165 P 372. At page 434, this court said:

"Stated in broad terms, it is a rule of universal recognition that the government is not included in a general statute of limitation unless it is expressly or by necessary implication included. This rule is said to be founded upon the legal fiction expressed in the maxim *nullum tempus occurrit regi.* How-

ever, it is not necessary to predicate this salutary precept upon any fiction, since sound reason for the rule is found in the fact that *as a matter of public policy it is necessary to preserve public rights, revenues and property from injury and loss* by the negligence of public officers * * *." (Last italics ours.)

We must not overlook the pertinent fact that the act of 1915 is a prohibitory act; whereas, § 116-437, OCLA, provides for a forfeiture.

We made note above that § 116-437, OCLA, was a part of the general law relating to appropriators of water. Some basis for this contention is to be found in another section of the water code: § 116-426, OCLA. This section of the law requires the state engineer to issue a certificate to the applicant for a water right when the appropriation has been perfected in accordance with the law. It then provides:

"* * * Rights to the use of water acquired under the provisions of this act, as set forth in any such certificate, shall continue in the owner thereof so long as such water shall be applied to a beneficial use under and in accordance with the terms of said certificate, subject only to loss by nonuse as specified and provided in Section 116-437 * * *."

Further observation is made of the fact that the 1915 law (§ 7113, Oregon Laws) is only one of many laws of that type, in none of which the state is specifically mentioned, but in all of which the words of prohibition are all-inclusive. §§ 116-461, 116-462, 116-464, 116-466, 116-468, OCLA. For example, § 116-464, OCLA, reads as follows:

"It hereby is provided that the waters of Hackett creek, a tributary of the Sandy river and which is located in Clackamas county, Oregon, together

with the tributaries of said Hackett creek, *shall be withdrawn from appropriation or condemnation and shall not be diverted or interrupted for any purpose whatsoever,* except for the purpose of protecting fish life therein by the Oregon state game commission.'' (Italics added.)

Section 116-465, OCLA, makes an exception to the prohibition contained in § 116-464, as to vested rights and condemnation for park purposes.

The prohibition contained in § 116-462, OCLA, relating to the waters of Silver creek, in Marion county, and Brushes creek, in Curry county, is in much the same words, and no exception is made in favor of the fish commission, though there is an exception as to vested rights and condemnation for park purposes.

Just as there is no real foundation for the court's first conclusion respecting the effect of the decisions in the Hawk and Hydro-Electric Corp. cases, neither is there any sound basis for the implications contained in its second conclusion, viz.; that "these decisions further indicate that, when a state agency exercising a power granted to it by the legislature, undertakes to appropriate any of the waters of the state, it must do so pursuant to the provisions of the water code.'' An examination of the statutes will conclusively show that state agencies are subject to the appropriation laws, not by virtue of those decisions, but because of the specific laws relating to their creation and powers. Every state agency, in appropriating water, is subject to the general appropriation laws as to the method of appropriating and as to priorities. This applies to cities, towns, irrigation districts, and other special agencies created, or authorized to be created, by legislative act.

However, the water code contains many provisions

limiting the time in which certain operations must commence as a condition for continuing a permit for the appropriation of waters. Cancellation of the permit is the penalty for failure to comply. But irrigation districts and municipal corporations are excepted from these provisions. § 116-430, OCLA. But these provisions refer to permits, and not to final certificates of appropriation.

The court in its opinion seems to deem it significant that cities and towns are expressly excepted from the provisions of § 116-437, OCLA; whereas, the state is not mentioned. When the reason for specifically mentioning cities and towns in this exception is recognized, the exception has no significance whatever in the respects as claimed.

We have before observed that cities and towns are vested with the power of appropriation of waters and watercourses by the express provisions of § 12-304, OCLA. Because their authority to appropriate waters stands on the same foundation as that of private individuals and corporations, it was necessary to except them from the provisions of § 116-437, OCLA, if their rights were to be protected as regards reserves of water not presently being used, but important to meet the necessary demands of the future.

Furthermore, cities and towns are of lesser consequence than the state itself. By mentioning cities and towns, the legislature showed that it was thinking of necessary exemptions for the public good. The state, however, under the rule of *nullum tempus occurrit regi,* would be exempt. Hence, there was no need of mentioning it. That accounts for the act's omission to include it alongside the phrase "cities and towns". In other words, the lawmakers naturally assumed that, under the rule of *nullum tempus occurrit regi,* the state

would be held exempt without being specifically mentioned.

It is further to be observed that, though, in a technical sense, cities and towns are still referred to as arms of the state, nonetheless, by virtue of the provisions of § 2, art. XI, Oregon Const. (commonly referred to as the Home Rule Amendment), they are, in fact, more or less independent sovereignties and, in their operations, are subject only to the constitution and general laws of the state. They occupy an entirely different status in their relation to the state than do counties, irrigation districts, port districts, and other state agencies, such as the Fish and Game Commission, the Highway Commission, the State Tax Commission, and the numerous other boards and commissions created to carry out purely state functions. Cities and towns derive their principal powers from the constitution; the other state agencies and their powers stem from legislative act.

If the court is correct in its conclusions in this case, then it necessarily follows that irrigation districts, which are arms of the state, might lose their water rights for non-user, despite the importance attached to the operations of such districts by the provisions of § 125-303, OCLA, and other applicable statutes. It is to be observed that irrigation districts are not mentioned in the exceptions contained in § 116-437, OCLA.

As indicated, the operations of irrigation districts are deemed of highest importance. I quote a part of § 125-303, OCLA:

"The use of all water required for the irrigation of the lands of any district formed under the provisions of this act, together with all water rights and rights to appropriate water, rights of way for canals and ditches, sites for reservoirs, and all other

property required in fully carrying out the provisions of this act, hereby is declared to be a public use more necessary and more beneficial than any other use, either public or private, to which said water, water rights, rights to appropriate water, lands or other property, have been or may be appropriated within said district."

Irrigation districts, as well as the Fish and Game Commission, have the express power of acquiring water rights by condemnation, purchase, or appropriation. When they condemn or purchase, they acquire the water right from one who has already perfected it under the appropriation laws of the state. They have a choice as between condemnation, purchase, or appropriation. Obviously, there are times when appropriation of available waters would be much less expensive than condemnation or purchase, and just as satisfactory. It is manifest that both these state agencies might well acquire water rights for the sole purpose of providing reserves for use in cases of emergency, or for expanded operations, and not make use of the same unitl the necessity arose. As to these reserves, their needs are just as great as those of cities and towns. Is it the intention of the legislature that they shall lose those rights at the end of five years for non-user because they are not mentioned in the exceptions to § 116-437, OCLA? I think not.

It is unnecessary for me to discuss the several authorities in which the rules applicable to this case are set forth. They are cited and commented upon in the opinion of the court, including those which suggest an exception to the general rule. I adopt most of the discussion of the court respecting the several decisions to which attention has been directed, but I disagree with its final conclusions. The same discussion and

most of the argument presented completely justify a conclusion precisely opposite to that reached by the court. I do not believe that this case comes within the exception to the general rule.

I concede that § 116-437, OCLA, was adopted in the interests of public good. Every statute is presumably adopted with that in mind. But I maintain that protection of the state's revenues is also for the public good. This apparently presents a conflict of public interests to be weighed in the balance.

Although I deny that the state may be deemed bound by the forfeiture provision contained in the section of the water code now under discussion, inasmuch as it has not been specifically named therein; nevertheless, if the question of including it in or excluding it from the provisions of the act depends upon a decision as to which of the two mentioned public interests should be the determining factor, I subscribe to the proposition that the principle of conserving the state's revenues is more important to the public as a whole than is the assumed loss of the beneficial use of some water. By this I do not wish to be understood as discounting in the slightest degree the vital importance of water. However, aside from its use for industrial and municipal purposes, water is primarily used by individuals for irrigation needs. Its use is of particular importance to the arid and semi-arid sections of the state, most of which lie east of the Cascade mountains, though it is conceded that in recent years irrigation has become more and more important in some parts of the Willamette valley in western Oregon. As to the state's revenues, there is not a taxpayer who is immune to the injuries incident to a loss or dissipation thereof. Protecting the revenues is of statewide interest and importance. I do not think we are justified

in writing into this law, or into any other law, by implication, a provision that may seriously affect the state's revenues, particularly when, to do so, we must turn our backs upon a long and well established rule that the state is not to be deemed included in an act providing a limitation or forfeiture such as we have here, unless specifically named therein. In my opinion, such inclusion is exclusively a matter for legislative determination. It should not be accomplished by judicial legislation, which, I believe, is the effect of the proposed decision in this case.

In the opinion of the court the importance of preventing wastage of water is stressed, but it seems to me this is beside the issue, because I do not think the forfeiture for non-user clause was adopted for that purpose. The water code itself contains express provisions designed to prevent waste. For example §§ 116-303, 116-409, OCLA. Further, non-user by an appropriator of a water right does not necessarily mean that there is or will be a waste or loss of beneficial use of the water. The court in its opinion seems to assume that it does.

It is unimportant that insofar as this particular case is concerned no serious, if any, loss of revenue is threatened, no matter how we decide the matter before us. But the principle to be established is of high importance. What we say here will form the precedent for future action. Whatever we do must be done with an eye to that future.

I am of the opinion that the question of determining the legislative intent, as suggested in the court's opinion, is not at all involved. The statute is unambiguous. Recourse to rules of statutory construction is not necessary. The act should be interpreted according to its plain terms. It is presumed that, in adopting

this statute, the legislature did so with full knowledge of the general rule of law that the state would not be deemed as included in the limitations therein contained unless expressly named. It is manifest that no presumption should be indulged in that the legislature intended that the state's revenues should be jeopardized. Had it intended that the state be included, the legislature would have expressly said so.

It is admitted that in construing a statute, where construction is necessary, the intention of the legislature is to be pursued, if possible. § 2-217, OCLA. But this rule of statutory construction is no more important than the rule provided in § 2-216, OCLA, which in part reads as follows:

> "In the construction of a statute * * *, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, *not to insert what has been omitted,* or to omit what has been inserted * * *." (Italics added.)

For the reasons stated, I dissent.

ROSSMAN, J., concurs in this opinion.

LATOURETTE, J., DISSENTING.

The pivotal question in this case is whether or not the failure of the state of Oregon, successor to one Lowe, to use the water for a period of five years theretofore appropriated by said Lowe, a World War I veteran, deprived of it its water right under § 116-437, OCLA.

The legal principal involved in this case is well-stated in *State Land Board v. Lee,* 84 Or 431, 434, 165 P 372, as follows:

> "Stated in broad terms, it is a rule of universal recognition that the government is not included in

a general statute of limitation unless it is expressly or by necessary implication included. This rule is said to be founded upon the legal fiction expressed in the maxim *nullum tempus occurrit regi.* However, it is not necessary to predicate this salutary precept upon any fiction, since sound reason for the rule is found in the fact that as a matter of public policy it is necessary to preserve public rights, revenues and property from injury and loss by the negligence of public officers.''

There being nothing in § 116-437, OCLA, expressly providing that the state of Oregon is affected by such provision, the case is then brought down to the narrow question of whether or not the state becomes affected by such section by necessary implication in the interest of public policy. It is opined in the majority opinion that certain state agencies authorized by law to appropriate water are placed in the same category as individuals, and that they, therefore, are subject to the aforesaid five-year limitation. From this premise, it is concluded that the state in the present case, by analogy, would likewise be subject to such limitation. The distinction is that under the veterans' loan act there is no authority given to the veterans' commission to appropriate water. The statute is silent on this subject.

Somewhat related to this matter is the legislation authorizing the State Land Board to loan money from the irreducible school fund. There is nothing in that legislation authorizing such land board to appropriate water under the water code. If § 116-437, OCLA, applies to the case at bar, it would likewise apply to the State Land Board where loans are made from such irreducible fund to a person who had a water right covered by such loan, the State Land Board later acquiring the property to which such water right was appurtenant. In such a case, the State Land Board's

fund, instead of being irreducible, would be reducible, and public revenues would thereby be greatly affected because, without a water right, in some arid regions of the state, the land would be worthless. By analogy, therefore, it is obvious that under the prevailing opinion the state would be subject to great loss in revenue were it compelled to acquire land with an appurtenant water right in arid regions, such as we have in the present case, where veterans had defaulted in their loans.

The holding of the majority is a dangerous precedent and might lead to far-reaching, disastrous and damaging results.

It is significant that § 116-437, OCLA, exempts cities and towns from the five-year limitation. The reason for such limitation is apparent in that cities and towns have the right to appropriate the water under the water code, and had they not been exempt, it is clear that the legislature thought that having the same status as ordinary water appropriators, they might come within the five-year limitation. Had the legislature been of the opinion that the state might be considered as being included in such limitation, it is logical to assume that it would have expressly exempted itself. It seems a thin stretch of judicial construction to hold that the legislature would expressly exempt cities and towns and intend to include itself.

It is stated in the majority opinion that, "The determinative factor is whether 'the controlling motive' of the statute is the general good of the state." From this, it is argued that the beneficial use of water is of paramount importance to the general public, and, since, if the state does not utilize the water for a great many years, the public being deprived of its use, there would be great detriment to the public.

The preservation of the revenues of the state is also of paramount importance and, in my opinion, of greater general public importance than the alleged loss of the use of appropriated water in that the former touches the purse strings of all the public while the latter affects only the limited few water users.

It is well-known that in the arid regions of this state where irrigation is employed, the water rights appurtenant to the land give value to the land, and, without it, the land would be practically worthless, so that if the state were deprived of the water right when it acquired the land, as in the instant case, the state would lose nearly the entire loan made to the veteran, and if there would be a depression, the loss might run into a considerable amount of money. Such loss would have to be made up by the taxpayers of the state. On the other hand, where the state fails to use the water over an extended period of time, it does not necessarily mean that the water is wasted because, if there is a shortage of water, the appropriators below the state lands would enjoy the benefits of the water not used by the state.

I do not believe that § 116-437, OCLA, applies to the state in the instant case. I, therefore, dissent.